# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JERRY L. SHINABERRY,

      **Plaintiff,**

v.
                                **Civil Action No. 1:07CV28**
                                **The Honorable Irene M. Keeley**

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Jerry L. Shinaberry ("Plaintiff") protectively filed an application for DIB on June 3, 2003, alleging disability due to shortness of breath, chest pain, and lower back and leg pain (R.63-65, 160).

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

Plaintiff's applications were denied at the initial and reconsideration levels (R. 30-31). Plaintiff requested a hearing, which Administrative Law Judge Mark O'Hara ("ALJ") held on August 9, 2005 (R. 44-45, 622). Plaintiff, who was represented by counsel, testified on his own behalf (R. 6-25-41). Also testifying were Vocational Expert ("VE") J. Herbert Pearis (R. 645-52) and Vicki Shinaberry, Plaintiff's wife (R. 641-45). On December 19, 2005, the ALJ entered a decision finding Plaintiff retained the residual functional capacity to perform sedentary work (R. 12-29). On January 31, 2006, Plaintiff filed a Request for Review of Hearing Decision with the Appeals Council (R. 10-11). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6-8).

## II. FACTS

Plaintiff was born on July 12, 1956, and was 43 years old when he stopped working, 46 years old when he filed his application, and 49 years old at the time of the administrative hearing. He has an eleventh grade education and past relevant work as a coal mine machine operator (R. 15, 161).

On April 19, 2000, John D. Sharp, Ph.D., D.O., began medical care of Plaintiff for back pain. On this date, Plaintiff presented to Dr. Sharp with complaints that his back pain radiated to his hips and tailbone. Plaintiff stated he had injured his back by either pulling a cable at work or lifting a motor at home. Dr. Sharp prescribed Vioxx and referred Plaintiff to Dr. Douglas (R. 462).

On April 21, 2000, Plaintiff underwent a MRI of his lumbar spine. It showed degenerative disc disease "particularly effecting [sic] lower 2 or 3 lumbar vertebral levels as well as T12-L1 and L1-2." There was neural foraminal encroachment effacement inferiorly at the L4-5 level. There was no evidence of spinal canal stenosis or nerve root impingement (R. 461).

Also on April 21, 2000, Plaintiff had a x-ray made of his lumbar spine, which showed

"arthritic degenerative change with hyperostotic spurring" and possible "narrowing at L5-S1."

Dextroscoliosis was found in the thorcolumbar area (R. 460).

Plaintiff returned to Dr. Sharp on April 25, 2000, and informed him that the superintendent

at the mine where he worked would "let [him] go back to light duty" but he "would like to file for"

workers' compensation as his "back injury [was] related to work." Dr. Sharp continued Plaintiff on

Vioxx and began processing Plaintiff's paperwork for his worker's compensation claim (R. 459).

On April 28, 2000, Plaintiff's Safety director at his employer wrote the following:

> On or about April 15, 2000, Jerry Shinnaberry . . . came into the bath house walking with difficulty before the start of his shift. I asked Jerry what was wrong, had he gotten hurt the night before? Jerry replied "I was lifting a Subaru engine and hurt my back." Jerry then said if his back did not improve soon, that he was going to the doctor.

> Jerry started off work on April 19, 2000. On April 27, 2000, Larry Jones, superintendent of [the mine] and Jerry came into my office. Larry asked Jerry why he was now claiming on the job injury, when Jerry had told both of us previously, that he had injured his back lifting a Subaru engine. Jerry replied that his Dr. told him the lumbar sacral strain in his back and his herniated lumbar disc came from handling the miner cable all the time.

Mr. Ashley then stated that Plaintiff said he had to file for workers' compensation because he was

going to lose his house. His statement, as written by Ashley, is as follows:

> About 4-11-00 at about 10:00 PM my back started hurting while pulling miner cable. My back had been hurting since early in the year. I started going to Dr. Sharp in January and have been going about every (3) months since January.

On May 9, 2000, Plaintiff presented to Richard A. Douglas, M.D., F.A.C.S., with complaints

of low back pain and bilateral gluteal pain. Plaintiff stated he "presumed" he pulled a muscle on

April 11, 2000, at work when he "pull[ed] a cable into the miner" and at home when he did

additional lifting. Dr. Douglas found Plaintiff had no pleurisy or cough. Plaintiff complained of

shortness of breath with activities. Plaintiff did not have unstable gait (R. 233). Plaintiff stated he was treating his back condition with Lorcet, Alprazolam, and Vioxx. Plaintiff informed Dr. Douglas that he consumed one ounce of alcohol per week and used three cans of snuff per week. Dr. Douglas observed no cyanosis, clubbing, or edema of Plaintiff's extremities. He had minimal lumbar paravertebral spasm, negative straight leg raising test at ninety degrees, and negative internal and external rotation of femurs, bilaterally (R. 234). Plaintiff's motor strength was 5/5 in all major muscle groups, sensory examination was intact, and cerebellar examination was normal. Dr. Douglas reviewed Plaintiff's April 21, 2000, lumbosacral spine MRI and opined it revealed degenerative disc disease of the lumbar spine, with no disc herniation, fracture, or spinal stenosis (R. 235). Dr. Douglas did not recommend neurosurgical intervention but referred Plaintiff to physical therapy and pain management (R. 236).

On May 22, 24, 26, and 30, 2000, and June 1, 5, 8, and 13, 2000, Dr. Sharp treated Plaintiff's low back condition with a TENS unit, osteopathic manipulative technique ["OMT"], and ultrasound therapy (R. 456-57).

On June 16, 2000, Plaintiff was treated by Dr. Sharp with a TENS unit, OMT, and ultrasound therapy for his back pain. Plaintiff informed Dr. Sharp that he could not bend his neck and he could not stand for long periods. Dr. Sharp prescribed Vioxx, Lorcet, and Xanax (R. 455).

On June 20, 27, and 29, 2000, and July 6, 11, and 13, 2000, Dr. Sharp treated Plaintiff's low back condition with a TENS unit, hot packs, OMT, and ultrasound therapy (R. 452-54).

On July 18, 2000, Plaintiff reported to Dr. Sharp that his back pain continued but that the regular pain medication "[did] something" to alleviate it. Plaintiff's buttocks were numb and he could not sit. Mowing the grass exacerbated his pain. Dr. Sharp prescribed Lorcet, Vioxx, and

Xanax (R. 452).

On July 25 and 27, 2000, and August 3 and 8, 2000, Dr. Sharp treated Plaintiff's low back condition with a TENS unit, hot packs, OMT, and ultrasound therapy (R. 451-52).

On August 17, 2000, Plaintiff complained of having "bad days" due to pain. Dr. Sharp prescribed Lorcet and Xanax. He provided samples of Vioxx to Plaintiff (R. 450).

On August 29, 2000, Plaintiff complained of severe back pain to Dr. Sharp, which was the result of his having "worked on truck." Dr. Sharp treated Plaintiff's back pain with a TENS unit, hot packs, OMT, and ultrasound therapy on this date and also on August 31, and September 7, 2000 (R. 450).

On September 13, 2000, Plaintiff informed Dr. Sharp that there was a "popping" in his back and the pain was getting lower and worse. Plaintiff stated he woke every two to three hours due to pain. Plaintiff stated he was "trying to walk some," but could not walk up hills. Dr. Sharp prescribed Lorcet and Vioxx and treated Plaintiff with TENS unit, hot packs, OMT, and ultrasound therapy (R. 449).

On November 2, 7, 14, 16, 28, and 30, 2000, and December 5, 7, 12, and 14, 2000, Dr. Sharp treated Plaintiff's back pain with a TENS unit, hot packs, OMT, and ultrasound therapy. Also on December 14, 2000, Dr. Sharp prescribed Xanax and Lorcet to Plaintiff (R. 448).

On November 7, 2000, Dr. Sharp corresponded with Richard Cardos relative to Plaintiff's worker's compensation claim as follows:

> As I said before, (I think) that Jerry Shinaberry has pulled his low back lifting on a motor but he did continue to work. He then injured his back pulling a cable etc. in the coalmines. The "straw that broke the camels back" was the incident in the coalmine, which should be a compensable injury. I hope this can be cleared soon so that Mr. Shinaberry will be able to receive the proper appropriate medical care to

repair his back in order for him to return to work as a productive citizen.
(R. 446-447).

On December 21, 2000, and January 2 and 4, 2001, Dr. Sharp treated Plaintiff's back condition with a TENS unit, hot packs, OMT, and ultra sound therapy (R. 445).

On January 5, 2001, Plaintiff's back pain was treated by a TENS unit, hot pack, OMT, and ultrasound therapy by Dr. Sharp. His lungs were clear to auscultation. Plaintiff reported he had "slip[ped] a little on ice," causing his back to twist. Plaintiff stated he was "getting depressed waiting on" workers' compensation to decide his claim. Plaintiff's straight leg raising test was negative at seventy degrees on the left and eighty-five degrees on the right (R. 445).

Plaintiff's back pain was treated with a TENS unit, hot packs, OMT, and ultrasound therapy by Dr. Sharp on January 9, 11, 16, 18, and 30, 2001; February 1, 6, 8, 13, 15, 20, 22, and 27, 2001; and March1, 2, 8, and 13, 2001 (R. 424, 441-44).

On March 14, 2001, Plaintiff presented to Dr. Sharp with complaints of being "stiff all over" and having severe pain in low back and hips. Plaintiff's range of motion was reduced and his neck abduction/adduction were reduced. Dr. Sharp diagnosed chronic low back pain. He treated Plaintiff with a TENS unit, hot packs, OMT, and ultrasound therapy (R. 441).

On April 10 and 13, 2001, Plaintiff's back condition was treated by Dr. Sharp with a TENS unit, hot packs, OMT, and ultrasound therapy. On April 13, Plaintiff stated he could not sleep and was depressed. Plaintiff complained of numbness and pain that radiated to his legs and knees (R. 423, 440).

On May 1, 2001, Plaintiff underwent a bone scan, which was positive for "minor degenerative change." "[N]o evidence of metastatic deposit" and "no minor degenerative type

6

activity over the major joints" were found (R. 423, 439).

On May 7, 2001, Dr. Sharp treated Plaintiff's back condition with a TENS unit, hot pack, OMT, and ultrasound therapy. He reviewed the May 1, 2001, bone scan and opined it was normal. Plaintiff informed Dr. Sharp that he was "overall getting worse" in that he could not bend forward and that a trip to Lewisburg, West Virginia, "killed" him. Dr. Sharp referred Plaintiff to a Charleston, West Virginia, pain clinic. He also noted Plaintiff may consider physical therapy as treatment (R. 424).

On May 14, 2001, Plaintiff reported to Dr. Sharp that he was "fair." He had been "trying to turkey hunt"and had been walking. He received treatment with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 438).

On May 17 and 22, 2001, Plaintiff was treated for his back condition with a TENS unit, hot packs, OMT, and ultrasound therapy by Dr. Sharp. On May 22, 2001, Dr. Sharp prescribed Lorcet and Xanax (R. 438).

Dr. Sharp treated Plaintiff's back condition with TENS unit, hot packs, OMT, and ultrasound therapy on May 24 and 30, 2001, and June 5, 12, and 17, 2001 (R. 437).

On June 19, 2001, Plaintiff presented to Dr. Sharp with complaints of sleeplessness due to pain, inability to lift more than ten to fifteen pounds, and continuous pain, which radiated down both legs. Plaintiff's straight leg raising test was negative at sixty degrees on right and seventy degrees on the left. Plaintiff was waiting for workers' compensation approval for treatment at the pain clinic (R. 436). On June 21, 26, and 28, 2001, and July 3, and 5, 2001, Plaintiff was treated with a TENS unit, hot packs, OMT, and ultrasound therapy for his back pain by Dr. Sharp (R. 435).

On July 9, 2001, Dr. Sharp treated Plaintiff with a TENS unit, hot packs, OMT, and

ultrasound therapy for his back pain. Plaintiff stated he was unable to bend or pick up anything. Plaintiff stated he could not sleep and his pain never subsided. Plaintiff stated his back pain radiated to his right hip (R. 432).

On July 16, 2001, Dr. Sharp corresponded with West Virginia Workers' Compensation Division, seeking authorization to refer Plaintiff to Raymond Harron, M.D., a neurosurgeon, and for Plaintiff to undergo a MRI. Dr. Sharp wrote Plaintiff was temporarily totally disabled (R. 434).

On July 17, 19, 24, and 31, 2001, Dr. Sharp treated Plaintiff's back condition with a TENS unit, hot packs, OMT, and ultrasound therapy (R. 433).

In early September, Plaintiff reported to Dr. Sharp that he experienced pain and numbness in his right leg. Plaintiff stated he tried to walk and could not sleep. Dr. Sharp prescribed Vioxx, Lorcet, and Xanax (R. 431).

On September 13, 2001, Plaintiff was examined by A.E. Landis, M.D., for his back condition. Dr. Landis reviewed "various medical records" of Plaintiff, which were provided to him, a neurosurgical consultation from the West Virginia Neurosurgery and Spine Center in Clarksburg, and "various MRI and x-ray reports." Plaintiff reported he had injured his back at work in April, 2000, and had been treated conservatively (R. 249).

Plaintiff reported his pain was located in the middle of his lower back and was present at all times. Bending, lifting, prolonged standing, prolonged walking, and prolonged sitting increased his pain. Plaintiff reported his pain radiated to his right thigh and knee and increased when he lay down. Plaintiff stated he experienced numbness and tingling in his right thigh to his knee. Plaintiff stated Vioxx relieved his symptoms, but he had been taken off that medication and not returned to it. Plaintiff reported a TENS unit helped his symptoms "if he use[d] it long enough" (R. 250).

8

Dr. Landis found Plaintiff was in no distress and moved without restrictions. Plaintiff did not limp or need assistance in dressing or undressing or getting up on and down from the examination table. Plaintiff complained of back pain with range of motion testing, without any radicular component. Plaintiff had no tenderness or spasm. He could heel and toe walk. Supine straight leg raising test was forty-five degrees with pain and without radiation. Sitting straight leg raising test was 180 degrees. Plaintiff's sensory examination was intact in lower extremities, and his reflexes were brisk and symmetrical (R. 251). X-rays made that day and reviewed by Dr. Landis revealed degenerative lipping and minimal narrowing (R. 251). Dr. Landis noted Plaintiff's MRI scan showed no disc herniation or spinal stenosis and his bone scan was normal (R. 250).

In conjunction with the IME, Dr. Landis completed a Low Back Examination form of Plaintiff. He found Plaintiff stood unassisted, and had no scoliosis, antalgic lean, lumbar hypolordosis, or lumbar hyperlordosis. He found Plaintiff had no vertebral or coccyx tenderness to palpation. He had sacral base and pelvis level tenderness to palpation. Dr. Landis opined Plaintiff had no paraspinal muscle tenderness or spasm or sacroiliac joint tenderness, bilaterally. He did not attempt to squat. Plaintiff's range of motion results were as follows: sacral flexion ten degrees with pain; sacral extension five degrees with pain; forward bending thirty degrees with pain; backward bending fifteen degrees with pain, left side bending twenty degrees with pain; and right side bending twenty degrees with pain. Dr. Landis found Plaintiff's injury was not stable, his ranges of motion were curtailed due to pain, his three consecutive measurements were within five degrees of each other, and Plaintiff did not pass a validity test (R. 427). Plaintiff had normal motor strength in the following: hip flexion, hip extension, hip abduction, knee extension, knee flexion, ankle dorsiflexion, ankle planter flexion, great toe extension, heel toe walk, and toe walk (R. 428).

Dr. Landis diagnosed Plaintiff with "strain/sprain type of injury to his lower back . . . superimposed on some pre-existing degenerative changes . . ." (R. 251). He recommended Plaintiff treat his condition with "aggressive stretching exercise" and Vioxx (R. 252).

On October 3, 2001, Dr. Sharp treated Plaintiff's back pain with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 422).

On October 9, 2001, Plaintiff informed Dr. Sharp that his back pain was worse, he had numbness from his hip to his knee, and he had pain in his groin area. Dr. Sharp treated Plaintiff's pain with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 422).

On October 25, 2001, Plaintiff reported to Dr. Sharp that Vioxx was upsetting his stomach. Plaintiff reported pain in his groin area and that it was difficult for him to stand (R. 421)

On October 26, 2001, Plaintiff returned to Dr. Sharp for refills of his Vioxx and Lorcet. Plaintiff stated he could not sleep. Dr. Sharp recommended Plaintiff begin physical therapy (R. 422).

On January 8, 2002, Plaintiff was treated by Dr. Sharp with a TENS unit, hot pack, OMT, and ultrasound therapy for his back condition (R. 420).

On January 16, 2002, Plaintiff presented to Dr. Sharp with complaints of moderate to severe pain and soreness in his spine. Plaintiff stated he experienced episodes of his entire back hurting. Plaintiff stated he could not bend to pick up anything and that he could "hardly put shoes on." Plaintiff informed Dr. Sharp that physical therapy made his condition worse. His straight leg raising test was negative at sixty degrees on the right and eighty-five degrees on the left. Dr. Sharp prescribed a home TENS unit and Vioxx to Plaintiff (R. 420).

On March 18, 2002, Plaintiff had a x-ray made of his lumbar spine. It showed minor disc space narrowing at T12-L1 and L1-2 and mild marginal spurring. The impression was for "mild

10

degenerative change" (R. 419).

Also on March 18, 2002, a MRI was made of Plaintiff's lumbar spine. The impression was for "mild degenerative disc disease and tiny central disc protrusions noted T12-L1 and L1-2" and "no other significant abnormalities [were] seen and there [was] no demonstrable metastatic disease" (R. 418).

On May 8, 2002, Plaintiff was evaluated by Raymond V. Harron, D.O. Dr. Harron reviewed Plaintiff's March, 2002, MRI scan and found "no real significant change in his study in comparison from the study of 2000." Dr. Harron noted "some degenerative changes up at the T12-L1 and L1-L2 region [and] L4-L5 level." Plaintiff's examination was normal (R. 254).

On June 3, 2002, Plaintiff underwent a lumbar myelogram CT scan. It showed "mild diffuse disc bulge at L4-5 without significant mass effect" and "mild disc bulge L5-S1 without significant mass effect" (R. 415). The lumbar myelogram also showed minimal anterior epidural impression at L3-4 and L4-5 and no lateralizing (R. 414).

Dr. Landis examined Plaintiff on June 10, 2002 (R. 237). Upon examination, Dr. Landis found Plaintiff was in no distress, moved without restriction, did not limp, and could dress, undress, and get up on and down from the examination table without difficulty. Plaintiff's range of motion was forward flexion forty degrees, extension fifteen degrees, right side bending twenty degrees, and left side bending twenty-five degrees, with complaints of pain and no radiation. Plaintiff had no spasm and could heel and toe walk without difficulty. Plaintiff had some tenderness to palpation at L5-S1. Plaintiff's sitting straight leg raising test was 180 degrees and his supine straight leg raising test was forty five degrees due to pain and without radiation. There was no motor weakness in the lower extremities (R. 238-39). Plaintiff reported none of the treatments he had received relieved his

11

symptoms to any extent, but therapy and medication relieved his spasms (R. 238).

Dr. Landis reviewed Plaintiff's June 3, 2002, myelogram/post myelogram CT scan, and opined they showed no disc herniation and no neurosurgical lesion. He found Plaintiff's x-rays revealed degenerative changes at L1 on the left, anterior lipping, mild narrowing at L5-S1, mild facet joint changes at L5-S1, and superior lipping (R. 239).

Dr. Landis opined Plaintiff had reached maximum degree of medical improvement from his strain/sprain injury and did not require any additional treatment. He found Plaintiff was no longer temporarily totally disabled and was "certainly capable of performing at least sedentary type work" (R. 239).

On June 26, 2002, Dr. Harron communicated with Dr. Sharp that he had reviewed Plaintiff's lumbar myelogram and post-myelographic CT scan and found Plaintiff had mild disc bulging at L4-L5 and L5-S1, but no nerve root or spinal cord compression. Dr. Harron opined Plaintiff did not require surgery and should be treated conservatively for his condition (R. 253).

On July 2, 2002, Dr. Sharp noted Plaintiff had tenderness at his L1-2 area. Plaintiff stated he could not "do anything." Dr. Sharp treated Plaintiff's condition with a TENS unit, hot packs, OMT, and ultrasound therapy (R. 425).

On July 18, 2002, Plaintiff reported to Dr. Sharp that "driving kill[ed]" him, that he could not perform yard work or operate a chain saw (R. 426).

On August 26, 2002, Plaintiff informed Dr. Sharp he had continued back, tailbone, and groin pain. Plaintiff stated he had driven to Elkins and back to home, which caused him to be unable to sit. He was treated with a TENS unit, hot pack, OMT and ultrasound therapy (R. 413).

On September 17, 2002, Plaintiff presented to Dr. Sharp with complaints of pain down the

12

back of his right leg to his ankle and spasms to his mid back. Plaintiff's condition was treated with a TENS unit, hot packs, OMT, and ultrasound therapy. Dr. Sharp provided Celebrex samples to Plaintiff and prescribed Lorcet, Xanax, and Zanaflex (R. 412).

On September 18, 2002, Plaintiff presented to Dr. Sharp with complaints of continuing groin pain and back pain that radiated to his hips. Plaintiff stated he had a "knot on [right] side [of] back [at] S1." Plaintiff reported pain in his groin to his ankle when he tried to cut firewood. Plaintiff's straight leg raising test was forty degrees on the right and sixty degrees on the left (R. 411).

On October 16, 2002, Plaintiff presented to McClung Health & Wellness Center and was examined by Charles McClung, D.O. Plaintiff stated he had low back pain, right leg numbness into his knee, and muscle spasms in left back. Dr. McClung noted Plaintiff's lumbar myelogram was negative. He diagnosed lumbar sprain (R. 296). Dr. McClung recommended Plaintiff treat his back pain with ligament injections to his lower thoracic and lumbar spine every two weeks for a four-month period (R. 297, 410).

On October 22, 2002, Plaintiff presented to Dr. Sharp with complaints of severe pain in his right leg, numbness, groin pain, and severe muscle spasms in his right back. Plaintiff stated he could not bend forward to pick up anything from the floor. He was treated with a TENS unit, hot pack, OMT, and ultrasound therapy. Dr. Sharp prescribed Lorcet, Xanax, and Zanaflex (R. 409).

Plaintiff reported to Dr. Sharp on October 30, 2002, that his back pain continued and that bending over the day before caused his back pain to become "severe." Dr. Sharp diagnosed "low back chronic pain."

On November 7, 2002, Plaintiff was treated by Dr. Sharp with a TENS unit, hot packs, OMT, and ultrasound therapy. Plaintiff reported Vioxx was not "helping" relieve his pain (R. 407).

13

On November 18, 2002, Plaintiff reported to Dr. Sharp that his low back pain continued, rehabilitation therapy was making his condition worse, he was not sleeping, his right leg was numb and he still had pain in his groin. Dr. Sharp treated his symptoms with a TENS unit, a hot pack, OMT, and ultrasound therapy (R. 406).

On December 4, 2002, Plaintiff received an ligament injection from Dr. McClung, which, according to Plaintiff, caused back spasms and did not relieve his pain (R. 294, 295).

On December 10, 2002, Plaintiff reported to Dr. Sharp that his back pain was worse and that he had muscle spasms. He was treated with a TENS unit, hot pack, OMT, and ultrasound therapy. Dr. Sharp prescribed Lorcet, Xanax, and Vioxx (R. 405).

On December 19, 2002, Plaintiff received another injection from Dr. McClung (R. 294).

On January 8, 2003, Plaintiff reported to Dr. McClung that his previous injection had "helped for 1 to 1 1/2 days" and that he experienced lower back pain on both sides of his spine. Dr. McClung gave Plaintiff an ligament injection (R. 293).

On January 9, 16, and 23, 2003, Plaintiff presented to Dr. Sharp with complaints of continued back pain. He was treated with a TENS unit, a hot pack, OMT, and ultrasound therapy (R. 402-04).

On January 22, 2003, Plaintiff reported to Dr. McClung that his previous injection "felt good [for] 3 days past injections." Plaintiff received a ligament injection (R. 292).

On January 27, 2003, Plaintiff told Dr. Sharp his pain was "bad again," his "back muscles [were] hard as knots," and he was "ok" if he did not do anything, but "down 3 days" if he did. Dr. Sharp opined Plaintiff should participate in physical therapy and work hardening; treated him with a TENS unit, hot pack, OMT, and ultrasound therapy; and prescribed Zanaflex, Xanax, and Vioxx (R. 401).

On February 12, 2003, Plaintiff reported to Dr. McClung his previous injection caused "alot [sic] of pain & muscle spasms [for] 2 weeks." Plaintiff stated he had been doing better until he trimmed trees. Plaintiff received a ligament injection (R. 291). Plaintiff also received an injection from Dr. McClung on March 5, 2003 (R. 290).

On March 14, 2003, a x-ray was made of Plaintiff's chest. It revealed "interstitial fibrosis with progressive mass of fibrosises [sic] highly consistent with a coal worker's pneumoconiosis" (R. 255).

Also on March 14, 2003, a pulmonary function test showed "mild restriction." Plaintiff's predicted FVC was 4.58 liters and the actual readings were 3.36 (73.44% of predicted), 3.22 (70.33% of predicted) and 3.18 ( 69.40% of predicted). Plaintiff's predicted FEV-1 was 3.74 liters and the actual readings were 2.56 (68.58% of predicted), 2.67 (71.41% of predicted), and 2.63 (70.51 of predicted (R.259).

On March 19, 2003, Plaintiff reported to Dr. McClung his pain had increased because he had had driven his car for two hours. Dr. McClung noted Plaintiff had reduced swelling of his low back muscle. Plaintiff reported pain relief for two days from his previous injection. Plaintiff received a ligament injection (R. 289).

On March 25, 2003, Plaintiff presented to Dr. Sharp with complaints of continued back pain. He stated he had numbness down the right leg to his knee and muscle spasm in his thoracic spine. Plaintiff reported a "knot came out on [his] spine" and "went away [by his] using heat & ice" (R. 400).

On March 28, 2003, Plaintiff reported he had realized "alot" (sic) of relief from his previous injection from Dr. McClung (R. 288).

On March 31, 2003, Plaintiff returned to Dr. Sharp, where he was treated for his back condition with a TENS unit, a hot pack, OMT, and ultrasound therapy. He reported the ligament injections he was receiving from Dr. McClung were "helping some." Dr. Sharp prescribed Lorcet, Vioxx, and Xanax to Plaintiff (R. 399).

On April 7, 2003, Plaintiff received an epidural lumbar injection from Dr. McClung. Plaintiff reported the injections helped relieve spasms and he had "tried to run power saw" (R. 287).

On April 8, 2003, Plaintiff presented to Dr. Sharp with complaints of continued back pain, chest pain, and shortness of breath (R. 398).

On the 10th of April, 2003, Plaintiff was treated by Dr. Sharp with a TENS unit, a hot pack, OMT, and ultrasound therapy for his continued back pain. Dr. Sharp ordered a x-ray of Plaintiff's chest and noted it may have shown a mass in the right upper lobe. Plaintiff's EKG was normal. Dr. Sharp, based on his reading of the chest x-ray, referred Plaintiff to a pulmonologist (R. 397).

On April 15 and 16, 2003, Plaintiff was treated for his back condition by Dr. Sharp with a TENS unit, a hot pack, OMT, and ultrasound therapy (R. 395, 396).

On April 16, 2003, Dr. Sharp completed a Physician's Report of Occupational Pneumoconiosis of Plaintiff for West Virginia Workers' Compensation Fund. He noted he had first treated or examined Plaintiff for this condition on March 14, 2003. He opined Plaintiff had never had and did not then have pneumonia, pleurisy, asthma, tuberculosis, angina pectoris, coronary occlusion, rheumatic heart disease, congestive heart failure, or arthritis. Dr. Sharp noted Plaintiff's current complaints were for dry cough for five years, shortness of breath (worse with exertion) for five years, wheezing (with exertion) for five years, and orthopnea (R. 393). Dr. Sharp opined Plaintiff's breath sounds were coarse. He noted Plaintiff had chest pain and shortness of breath with

increased to normal exercise. Dr. Sharp wrote Plaintiff's "SOB and sweats had increased over the past year" (R. 394).

On April 17, 2003, Jaroslaw Pondo, M.D., completed a Routine Abstract Form – Physical of Plaintiff (R. 318). Plaintiff's gait, station, fine motor ability, gross motor ability, joints, and muscle bulk were all normal. Plaintiff's ranges of motion, reflexes, sensory deficits, motor strength, coordination, and mental status were normal. Plaintiff's cardiovascular examination was normal. Plaintiff's breath sounds were abnormal; his dyspnea, with exertion, was normal. Plaintiff's orthopnea, cyanosis, and edema were normal (R. 319). Plaintiff's digestive system was normal (R. 320). Plaintiff was diagnosed with pneumoconiosis (R. 317).

On April 17, 2003, a CT scan was made of Plaintiff's chest. It showed "pneumoconiosis, denser and more massive on the right" (R. 316).

On April 21, 2003, the State Division of Rehabilitation Services submitted a Vocational Progress Report (R. 195). Under Summary of Vocational Issues, the reviewer wrote:

> Right now Jerry is very concerned about the nature and the extent of his lung problem and treatment options, which undoubtably will affect his return to work potential. He has shortness of breath with minimal exertion. He is equally limited by his pulmonary and his musculoskeletal conditions. A return to work in the coal mines is looking less and less likely. He has earned very good wages and lacks the education and skills to obtain more sedentary and undoubtedly more technical and clerical types of work that would provide commensurate wages. In addition, he lives in a very rural area where employment options are very limited and he does not want to relocate. Improvement in physical functioning and improvement in academic achievement are critical to successfully return to work.

On April 22, 2003, Plaintiff was admitted, for a "short stay," to Davis Memorial Hospital. He was diagnosed with pneumoconiosis (R. 314). The x-ray made that day at the Davis Memorial

Hospital showed no pneumothorax and no pneumomediastinum (R. 313). Also on this date, Plaintiff underwent a right upper lobe lung washing. It showed no malignancy (R. 312). The biopsy of Plaintiff's right upper lobe of his lung, taken on April 22, 2003, showed "bronchial mucosa with fibrosis, chronic inflammation, and deposition of both polarizable and non-polarizable foreign material consistent with anthracosis and silicosis" (R. 310-11).

On April 23, 2003, Plaintiff presented to Dr. Sharp with complaints of continued back pain. He reported numbness in his arm. Plaintiff stated his pain was chronic. Plaintiff was treated with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 392).

On April 30, 2003, Plaintiff returned to Dr. Sharp for TENS unit, hot pack, OMT and ultrasound therapy treatment for his back. Plaintiff reported pain between his shoulders to his neck and shortness of breath with exertion. Dr. Sharp prescribed Lorcet, Vioxx, Xanax, and Zanaflex (R. 391).

On May 5, 14, 23, and June 2, 2003, Plaintiff reported significant pain in his back to Dr. McClung. He received ligament injections (R. 283-86).

On May 6, 2003, Plaintiff reported to Dr. Sharp that he had undergone manipulation therapy with Dr. McClung on May 5 and he "felt something catch in [his] back." Plaintiff was treated with TENS unit, hot pack, and ultrasound therapy (R. 390).

On May 9, 2003, Plaintiff was examined by Dr. Pondo, who found his neck supple and his chest clear to auscultation. There was no clubbing, cyanosis, or edema in his extremities. Plaintiff was neurologically intact. Plaintiff was diagnosed with pneumoconiosis and silicosis (R. 309).

On May 15, 2003, Plaintiff reported to Dr. Sharp that he had received a ligament injection to his spine on May 14, 2003, and that it was "helping" his back pain. Plaintiff was treated with a TENS unit, hot pack, OMT, and ultrasound therapy. He was referred by Dr. Sharp to TriState Occupational Rehabilitation (R. 389).

Plaintiff reported to Dr. Sharp on May 22, 2003, that his low back pain continued but that the ligament injections provided by Dr. McClung were "helping." Plaintiff was treated with TENS unit, hot pack, OMT, and ultrasound therapy (R. 388).

Plaintiff was again treated for low back pain by Dr. Sharp on May 27, 2003, with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 387).

On June 3, 2003, Plaintiff reported to Dr. Sharp that he had received a ligament injection from Dr. McClung on June 2, 2003. Plaintiff stated he had developed neck pain about one and one-half months ago. He had received manipulation therapy from Dr. McClung, but reported pain between his shoulders and into his neck caused severe headaches. Plaintiff stated his neck "grind[ed] and pop[ped]" and was "tight." Dr. Sharp prescribed Toradol, Lorcet, Medrol DosePak, and Percocet (R. 386).

On June 11, 2003, Plaintiff reported neck pain to Dr. McClung and reported his last injection "helped" for three days. Plaintiff received an injection (R. 282).

Plaintiff reported neck pain and headaches to Dr. Sharp on June 12, 2003. Plaintiff was instructed to treat his symptoms with a home TENS unit. Dr. Sharp scheduled an appointment for Plaintiff with TriState Occupational Rehabilitation for June 20, 2003 (R. 385).

On June 24, 2003, Plaintiff presented to Dr. Sharp with complaints of constant low back pain and neck pain. He reported he had experienced a flat tire, but could not change it himself. Dr. Sharp

19

treated Plaintiff with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 384).

On July 1, 2003, Plaintiff reported to Dr. Sharp he experienced increased cervical pain. He was treated with a TENS unit and hot pack to his neck. Dr. Sharp prescribed Lorcet, Vioxx, and Xanax (R. 383).

On July 9, 2003, Plaintiff informed Dr. McClung he did not want additional injections to his neck as it caused soreness. He realized relief from back pain for fourteen days from his previous ligament injection. Plaintiff received a lumbar injection (R. 281).

On July 11, 2003, Dr. Pondo examined Plaintiff. Plaintiff denied "any shortness of breath more than usual." Plaintiff stated he experienced "on and off" chest pain and no hemoptysis. Plaintiff's chest was clear to auscultation; his heart rate was regular; he had no clubbing, cyanosis, or edema; his neurological examination was intact. Plaintiff was diagnosed with pneumoconiosis/silicosis (R. 308).

On July 18, 2003, Plaintiff reported to Dr. McClung his previous injection "helped for a few days," but he experienced neck, low back, and groin pain. He received a ligament injection (R. 280).

On July 21, 2003, Plaintiff reported to Dr. Sharp he had fallen on a concrete floor and had injured his neck. Dr. Sharp treated him with a TENS unit, hot pack, OMT, and ultrasound therapy; prescribed Percocet; and referred Plaintiff to a pain clinic in Charleston, West Virginia (R. 382).

On July 23, 2003, Plaintiff was treated by Dr. Sharp with a TENS unit, hot pack, OMT, and ultrasound therapy; Toradol was prescribed (R. 381).

On July 24, 2003, Plaintiff underwent a pulmonary function study at Occupational Lung Center for the West Virginia Occupational Pneumoconiosis Board. Plaintiff performed this test while resting and only pre-bronchodilator due to heart disease. Plaintiff's spirometry ranged from

fifty-three to eighty-five percent of predicted value. Plaintiff's diffusion ranged from sixty and eighty-nine percent of predicted value (R. 113, 474, 477, 510).

Plaintiff received a ligament injection from Dr. McClung on July 28, 2003, after informing the doctor that the injections were "helping the back some" (R. 279).

On July 31, 2003, Plaintiff presented to Pocahontas Medical Clinic with cough, chest congestion, sinus drainage, and temperature. He was treated by a physician's assistant. He was prescribed Levaquin, Atrovent, Albuterol, and Advair (R. 380).

On August 5, 2003, Plaintiff was treated for his back pain with a TENS unit, hot pack, and ultrasound therapy by Dr. Sharp (R. 379).

Also on August 5, 2003, Dr. Sharp completed a Routine Abstract Form Physical of Plaintiff for the Disability Determination Section of the State of West Virginia. Dr. Sharp noted Plaintiff had been diagnosed with COPD, Black Lung disease, lumbosacral strain, lumbar disc disease and "c-strain." Dr. Sharp opined Plaintiff's respiration was sixteen and that he walked with a limp (R. 376). Dr. Sharp found Plaintiff's vision abnormal, but his hearing and speech normal. Dr. Sharp opined Plaintiff's joints were normal. He found the following musculoskeletal components abnormal: gait and station due to limp; legs' fine motor ability; legs' gross motor ability, left and right lower extremities' ranges of motion; and right lower extremity's muscle bulk. Plaintiff's right lower extremity was abnormal in reflexes, sensory deficits, motor strength, coordination, frequency of seizures and/or blackouts, and mental status (Dr. Sharp noted Plaintiff was depressed). Plaintiff's respiratory functions of cyanosis and edema were normal; however his breath sounds, orthopnea, and dyspnea (with exertion and at rest) were found to be abnormal. Dr. Sharp found Plaintiff's heart sounds, extremities, and circulation were normal. There was no evidence of congestive heart failure.

Dr. Sharp found Plaintiff experienced chest pain due to his lungs, pneumonia, and chronic cough (R. 377). Plaintiff's digestive system was normal (R. 378).

Dr. Sharp noted Plaintiff received injections from Dr. McClung and had been examined for Black Lung disease. Dr. Sharp noted Plaintiff experienced chronic pain in his lumbar spine, right sciatic neuralgia, right leg numbness, and headaches. Dr. Sharp opined Plaintiff was unable to bend, lift, sit or ride for over twenty to thirty minutes. Dr. Sharp opined Plaintiff was "unable to engage in any physical exercise." Dr. Sharp found Plaintiff was "functionally limited" in "physical exercise and sitting." He found Plaintiff could "only drive over 30-40 minutes [with] rest" (R. 378).

On August 13, 2003, Plaintiff was treated by Dr. Sharp for his low back pain with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 375).

On August 18, 2003, Plaintiff presented to Dr. Sharp and reported he continued to receive ligament injections and these "help[ed]" his low back pain; he experienced pain in his neck, pain in his right side, and numbness in his fourth and fifth right digits. Dr. Sharp noted Plaintiff's cervical spine was "tender" (R. 374).

On August 25, 2003, Dr. McClung noted Plaintiff had "improved mobility" in his "L/S spine" and that the last injection had "done good" in treating Plaintiff's back pain (R. 278).

On August 26, 2003, Plaintiff reported to Dr. Sharp that he had received a ligament injection on August 25, 2003, from Dr. McClung, which caused his back to feel "better." Dr. Sharp prescribed Lorcet, Vioxx, and Xanax (R. 373).

On September 4, 2003, Plaintiff presented to Dr. Sharp with complaints of continued back pain. Dr. Sharp noted Plaintiff's lumbar spine was tender; he had loss of lordosis; loss of range of motion; painful range of motion; and painful flexion, extension, and lateral rotation. He treated

22

Plaintiff with a TENS unit, hot pack, OMT, and ultrasound therapy. Dr. Sharp prescribed Lorcet, Vioxx, and Xanax (R. 372).

On September 10, 2003, a state-agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. The state-agency physician found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 261). Plaintiff was found to be frequently limited in his ability to climb, balance, stoop, kneel, crouch, and crawl (R. 262). The state-agency physician found Plaintiff had no manipulative, visual, or communicative limitations (R. 263-64). Plaintiff was found to be unlimited in his exposure to extreme cold and heat, wetness, humidity, noise, vibration, and hazards. The state-agency physician found Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation (R. 264).

On September 11 and 16, 2003, Plaintiff was treated with a TENS unit, hot packs, and ultrasound therapy by Dr. Sharp for his pain (R. 370-71).

On September 24, 2003, Dr. Sharp wrote a letter to the West Virginia Workers' Compensation Division relative to Plaintiff's occupational pneumoconiosis. In the letter, Dr. Sharp sought approval for payment for pulmonology evaluations, a chest CT scan, endobronchial scoping, a PET scan, and prescriptions for Singulair and Albuterol (R. 368). Dr. Sharp wrote that recent x-rays of Plaintiff's chest showed increased densities in his lungs, as compared with the 1998 x-rays. Dr. Sharp noted Singular and Albuterol "help[ed] [Plaintiff] to breath more easily" (R. 369, 504).

On October 2, 10, and 16, 2003, Plaintiff's symptoms were treated by Dr. Sharp with TENS unit and hot pack. Dr. Sharp prescribed Lorcet, Vioxx, Xanax, and Zanaflex to Plaintiff on October

2, 2003 (R. 365-67).

On October 9, October 20, and October 29, 2003, Plaintiff received ligament injections from Dr. McClung. Plaintiff reported the injections helped his pain and/or spasms (R. 274-76).

On October 16, 2003, Dr. Sharp wrote a letter of the West Virginia's Workers' Compensation Division, requesting authorization for treatment of Plaintiff for an acute lower respiratory infection. Dr. Sharp wrote the x-ray revealed Plaintiff had pneumonia, not mycloplasm, of his left lung. Plaintiff was positive for rales and rhonci. Dr. Sharp had treated Plaintiff with injections of Claforan, DepoMedrol, and Vitamin B12 and provided him with samples of Avelox (R. 364, 503).

Plaintiff was treated with a TENS unit, hot pack, OMT, and ultrasound therapy by Dr. Sharp on October 21, 2003, for his back condition (R. 363).

On October 23, 2003, Plaintiff underwent a PET scan. The impression was for "findings most consistent with pneumoconiosis/silicosis" and "no evidence for extra thoracic abnormal uptake" (R. 362).

On October 30, 2003, Plaintiff presented to Dr. Sharp with complaints of continued back pain. Plaintiff stated he experienced numbness in his right leg to his knee "all the time." He was treated with a TENS unit and a hot pack. Dr. Sharp prescribed Lorcet, Vioxx and Xanax (R. 361).

On November 8, 2003, Plaintiff reported to Dr. McClung his sciatic nerve was much better, but he still experienced back pain. He received an injection (R. 273).

On November 10, 2003, Plaintiff was examined by Dr. Pondo, who found his neck supple, his chest clear to auscultation, and him neurologically non focal. Dr. Pondo noted Plaintiff's PET scan was "positive in the lungs [m]asses no extra thoracic uptake," which was consistent with inflammation. He diagnosed Plaintiff with pneumoconiosis and prescribed Prednisone (R. 307).

24

On November 11, 2003, James E. Bland, M.D., examined Plaintiff's ears, nose, oral cavity, nasopharynx, hypopharynx, larynx, and neck. The examination was normal (R. 268-69).

On November 12, 2003, Plaintiff reported to Dr. Sharp that his back, neck, and shoulder pain continued and was treated with a TENS unit, hot pack, and ultrasound therapy. He reported he had received an injection from Dr. McClung, but it did not "help numbness & pain . . ." (R. 360).

On November 19 and 25, 2003, and December 3, 2003, Plaintiff presented to Dr. Sharp with continued back pain. He was treated with TENS unit, hot pack, OMT, and ultrasound therapy. On December 3, 2003, Dr. Sharp prescribed Vioxx, Xanax, and Lorcet (R. 357-59).

On November 20, 2003, Plaintiff informed Dr. McClung that he still had some pain in his groin and some swelling in his lower back after the last injection, but that all of sciatic nerve pain was gone. Plaintiff received an injection (R. 272).

On December 3, 2003, Dr. Sharp wrote to the West Virginia Workers' Compensation Division, requesting approval for Singulair and Albuterol for Plaintiff. He wrote that Plaintiff continued to experience shortness of breath and occasional lung pain and that both of these medications "help[ed] to ease [his] discomfort and enable[d] him to breathe easier" (R. 356, 507).

Plaintiff received a ligament injection from Dr. McClung on December 8, 2003 (R. 271).

Plaintiff's examination by Dr. Pondo on December 11, 2003, yielded the same results as the examination on November 10, 2003. Dr. Pondo diagnosed "pneumoconiosis/massive" and progressive fibrosis. He ordered a CT scan to evaluate Plaintiff's response to Prednisone (R. 306).

On December 19, 2003, Plaintiff had a CT scan of his chest. The impression was for bilateral upper lobe mass, which was compatible with progressive massive fibrosis and was relatively stable in appearance over the past eight months. There was a slight decrease in inflammation of the

perihilar regions, as compared with a prior study. There were no changes which were suggestive of malignancy (R. 305).

Dr. Pondo assessed Plaintiff on January 15, 2004, and found his neck supple, chest clear to auscultation, and extremities without clubbing, cyanosis, edema. Plaintiff was neurologically non focal. Dr. Pondo diagnosed pneumoconiosis and massive fibrosis (R. 304).

On January 29, 2004, Plaintiff underwent a treadmill stress test. He was tested at two miles per hour and achieved his target heart rate. Plaintiff tolerated the test well, without complications. Plaintiff's post-test readings were as follows: pH 7.38; pCO2 36; pO2 57; HCO3 20, B.E. -3.6, and O2 Sat. 89 (R. 100, 529).

Also on January 29, 2004, Plaintiff underwent a pulmonary function study at Chest Medical Services. His pre-drug spirometry scores ranged from sixty-five to ninety-eight percent of predicted value (R. 109, 539).

On February 11, 2004, Dr. Sharp wrote to the West Virginia Workers' Compensation Division, requesting authorization for Plaintiff to be treated for bronchitis and pneumonia. Dr. Sharp wrote that Plaintiff's experienced coughing, shortness of breath, and congestion. His examination revealed reduced breath sounds in his lungs, and the chest x-ray "revealed an infiltrate in the left lower and mid base." Dr. Sharp reported he had injected Plaintiff with Claforan, DepoMedrol, and Vitamin B12 and prescribed Avelox. Dr. Sharp referred Plaintiff to Dr. Pondo for further evaluations (R. 353, 502).

On February 16, 2004, Dr. Pondo diagnosed Plaintiff with pneumoconiosis. His chest was positive for wheezes (R. 303).

Also on February 16, 2004, Sharon Joseph, Ph.D., completed a Neuropsychological

26

Screening Profile of Plaintiff. Plaintiff reported he had a back injury, Black Lung disease, and a neck injury. He reported migraine headaches and memory loss. Plaintiff listed his prescriptions as Albuterol, Singulair, Ipratropium Bromide, Vioxx, Tizanidine, Alprazolam, Lorcet, and Percocet (R. 298). Plaintiff stated he did not use tobacco and drank alcohol rarely. Plaintiff had never been treated for an emotional or psychological problem. Plaintiff informed Dr. Joseph he was being treated by Dr. Brick, a neurologist (R. 299).

Plaintiff's Verbal IQ was 75; Performance IQ was 80; and Full Scale IQ was 75. He was found to be in the Borderline Range of Intellectual Functioning (R. 299). Plaintiff was alert and oriented times three. Plaintiff reported difficulty sleeping, mild depression, and poor appetite. Plaintiff denied suicidal or homicidal ideations, hallucinations, delusions, preoccupations, obsessions, or compulsions. Dr. Joseph noted Plaintiff displayed no "obvious physical limitations relative to dexterity, ambulation, or speech." Plaintiff's motor activity was calm, posture was appropriate, eye contact and language were average, and speed of speaking was normal. Dr. Joseph found Plaintiff's immediate and remote memory to be normal and his recent memory to be mildly impaired. Plaintiff's judgment was found to be moderately impaired and his concentration was found to be mildly impaired (R. 300).

Plaintiff reported his activities of daily living were as follows: awoke at 9:00 a.m., drank coffee, watched television, ate dinner, and retired at 11:00 p.m. Plaintiff stated he would attempt to go outside in the afternoons, but that activity depended on the weather. Plaintiff could make his bed, dust, cook a meal, put away groceries, take out the garbage, walk to the mailbox, go grocery shopping, drive a car, and manage his finances. Plaintiff stated he could remember to turn off the stove. Plaintiff was unable to go up and down stairs well. Plaintiff stated he could "fish a little" and

27

he enjoyed playing cards. Plaintiff's socialization was considered to be within normal limits. Dr. Joseph found the following diagnostic impressions: Axis I – adjustment disorder with depressed mood; Axis II – Borderline Intellectual Functioning; and Axis III – back injury, neck injury, Black Lung, history of testicular cancer, migraine headaches (all per Plaintiff's report). Dr. Joseph found Plaintiff's psychological prognosis was fair and he could manage benefits (R. 301).

On February 18, 2004, Dr. Sharp corresponded with West Virginia Workers' Compensation Division, requesting authorization for Lorcet, Vioxx, Zanaflex, and Xanax for Plaintiff. Dr. Sharp wrote that Plaintiff's pain was "9/10 without pain medication, and 4/10 with pain medication." Dr. Sharp also wrote that it was his opinion that Plaintiff should undergo a pain management consultation to determine if any treatment should be taken to relieve Plaintiff's pain and chronic muscle spasms (R. 354).

In a separate letter to West Virginia Workers' Compensation, dated February 18, 2004, Dr. Sharp requested approval for Singulair, Albuterol, and Zithromax for Plaintiff. Dr. Sharp reported Plaintiff continued to cough. Dr. Sharp wrote that Dr. Gaziano had recommended that Plaintiff be evaluated for a "mass/density that was seen in his lungs" (R. 352, 506).

On March 15, 2004, Plaintiff presented to Dr. Pondo with no cough and no fever. His neck was supple and his chest was clear to auscultation. Plaintiff's respiratory system was stable and Dr. Pondo noted he would observe Plaintiff "off r/x" (R. 302).

On June 2, 2004, a state agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. The physician found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for six hours in an eight hour work day, sit for a total of six hours in an eight hour workday, and push/pull unlimited (R. 322). Plaintiff

was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl (R. 323). It was determined that Plaintiff had no manipulative, visual or communicative limitations (R. 324-25). Plaintiff was unlimited in his exposure to extreme cold and heat, wetness, humidity, noise, and vibration. The state agency physician opined Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards (R. 325). The state agency physician reduced Plaintiff's RFC to light work (R. 326).

On June 4, 2004, Rosemary K. Smith, Ph.D., completed a Psychiatric Review Technique of Plaintiff. She found Plaintiff had an organic mental disorder (borderline functioning) and affective disorder (adjustment disorder) (R. 329, 330, 332). She found Plaintiff was mildly limited in his activities of daily living, moderately restricted in his ability to maintain social functioning, and mildly limited in his ability to maintain concentration, persistence, and pace. Dr. Smith found Plaintiff had not experienced episodes of decompensation (R. 339). She opined Plaintiff did not meet the "C" criteria of the Listings (R. 340).

Also on June 4, 2004, Dr. Smith completed a Mental Residual Functional Capacity Assessment of Plaintiff. She found Plaintiff was not significantly limited in his ability to remember locations and work-like procedures or in his ability to remember and understand very short and simple instructions. Dr. Smith found Plaintiff was moderately limited in his ability to understand and remember detailed instructions (R. 343). Plaintiff was found not to be significantly limited in his ability to carry out very short and simple instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; ability to make

simple work-related decisions; and ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 343-44). Plaintiff's ability to carry out detailed instructions was found to be moderately limited (R. 343). Dr. Smith found Plaintiff's ability to interact appropriately with the general public to be moderately limited. She found his abilities to ask simple questions, request assistance, accept instruction, respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or being distracted by them, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness were not significantly limited. Dr. Smith found Plaintiff was not significantly limited in his abilities to respond appropriately to changes in the work setting, be aware of normal hazards, take appropriate precautions, travel in unfamiliar places, use public transportation, set realistic goals, or make plans independently of others (R. 344). Dr. Smith opined Plaintiff would be "able to learn and perform simple, unskilled worklike activities" (R. 345).

On June 9, 2004, Joseph J. Renn, III, M.D., F.C.C.P., reported his findings relative to the independent medical evaluation he performed on Plaintiff on May 19, 2004. Plaintiff reported to Dr. Renn that he had exertional dyspnea when walking and climbing stairs, but not when he was involved with activities of daily living, such as eating, shaving, bathing, and dressing/undressing. Plaintiff stated he had a cough two to three days per week, which produced sputum (R. 117, 545). Plaintiff stated he gasped for breath with overexertion, had pneumonia on four occasions, and had hypertension since 2000. Plaintiff reported he did not have wheezing, paroxysmal nocturnal dyspnea, orthopnea, edema, palpitations, extra heartbeats, skipped heartbeats, angina pectoris, cardiac murmur, myocardial infarction, congestive heart failure, allergic rhinitis, asthma,

emphysema, bronchitis, or pleurisy. Plaintiff stated he had rubbed snuff from 1995 to 2001; he consumed two alcohol drinks per month; and he did not consume illegal drugs. Plaintiff treated his conditions with Singulair, Hydroco/APAP, Alprazolam, Tizanidine, Albuterol inhaler, and Albuterol and Ipratropium nebulizers (R. 118, 546).

Plaintiff stated he no longer wood worked, but he continued to fish and hunt (R. 118, 546). Plaintiff occasionally walked short distances for regular exercises. His usual activities were shopping with his wife, reading the newspaper, doing "some" yard work, and watching television (R. 119, 547).

Plaintiff's examination revealed he was in no acute distress; his cardiac exam showed no thrills, gallops, or murmurs; his lungs were clear to palpation, percussion, and auscultation; and there were no jugular venous distention, hepatojugular reflux, hepatomegaly, cyanosis, clubbing, or edema. Plaintiff's electrocardiograph was normal (R. 119, 547). Plaintiff's chest radiograph showed category "C" complicated pneumoconiosis and no other abnormalities. Plaintiff's spirometry, lung volumes, and resting arterial blood gases were normal. Plaintiff's diffusing capacity was moderately reduced, but it partially corrected toward normal when the alveolar volume was considered. Dr. Renn diagnosed "simple coalworkers' pneumoconiosis"; "complicated coalworkers' pneumoconiosis"; and "moderate diffusion abnormality" (R. 120, 548). Dr. Renn opined Plaintiff should not return to any type of "work where he [would be] exposed to coal mine dust owing to the presence of complicated coalworkers' pneumoconiosis" and that he was "totally and permanently impaired owing to both simple and complicated coalworkers' pneumoconiosis." Dr. Renn also found, based on a review of Plaintiff's medical records, that he was incapable of performing heavy manual labor for extended periods of time due to his exercise-induced hypoxemia (R. 121, 549).

31

On August 23, 2004, Plaintiff was awarded benefits by the U.S. Department of Labor, under the Black Lung Act, for pneumoconiosis (R. 67-70).

On October 14, 2004, Plaintiff underwent a resting pulmonary function study at the Occupational Lung Center for the West Virginia Occupational Pneumoconiosis Board. The exercise component of this test was not administered due to back pain. His spirometry score ranged from 73% to 95% of the predicted value, pre-bronchodilator, and 79% to 95% of the predicted value, post-bronchodilator. Plaintiff's diffusion score ranged from 56% to 80% of the predicted value, pre-bronchodilator, and 57% to 85% of the predicted value, post-bronchodilator (R. 145).

On December 1, 2004, Plaintiff was awarded 65% disability from the West Virginia Workers' Compensation Commission for occupational pneumoconiosis (R. 143).

On January 25, 2005, Dr. Sharp wrote a letter to Plaintiff's counsel, noting therein that Plaintiff could not walk three-hundred feet on a level surface at a slow pace and, if he were to carry ten pounds, his distance would be reduced to 150 to two-hundred feet. Plaintiff could walk fifty feet uphill, and, if he were to carry ten pounds or a gun, he could walk only 15 to twenty feet without resting. Dr. Sharp wrote that Plaintiff's neck and right arm pain prevented him from fly-fishing, but that he might be able to "sit by the lake with a cane pole" and fish. Dr. Sharp noted Plaintiff was unable to perform all of his activities of daily living and his parental obligations (R. 346). Dr. Sharp wrote Plaintiff was "unable to sit and drive over 15 miles without changing positions and stopping." Dr. Sharp opined "[t]here [was] no unskilled sedentary type work, . . . any where [sic] within an hours [sic] drive of his home" and he "doubt[ed] that [Plaintiff] [was] capable of maintaining any type of unskilled, sedentary job" (R. 347).

Also on January 25, 2005, Dr. Sharp completed a Medical Assessment of Ability to do Work-

Related Activities (Physical) of Plaintiff. Dr. Sharp opined Plaintiff's ability to lift and/or carry was affected by his impairment in that he could not bend, lift or squat; could lift ten to twenty pounds for "5 minutes max"; and was unable to carry. Plaintiff's standing/walking was affected by his COPD, "very limited lung capacity," and pneumoconiosis (R. 348). Dr. Sharp found Plaintiff could walk ten minutes without interruption and for less than thirty minutes total. Dr. Sharp opined Plaintiff could sit ten minutes without interruption and for a total of two hours per day. Plaintiff could never climb, balance, stoop, and crouch. Plaintiff could occasionally kneel, crawl, and push/pull. Dr. Sharp found Plaintiff was limited in reaching in all directions and gross manipulation with his right arm and hand, but had no other manipulative limitations (R. 349). Dr. Sharp opined Plaintiff had visual limitations without glasses, but no visual limitations when he wore his glasses. Dr. Sharp found Plaintiff's environmental restrictions included heights, moving machinery, temperature extremes, chemicals, and dust (R. 350).

On January 27, 2005, Mohamed Fahim, M.D., of the Pain Management Clinic at Davis Memorial Hospital, examined Plaintiff upon referral from Dr. Sharp. Plaintiff reported difficulty sleeping, neck and back pain, headaches, left leg weakness, and depression. Upon examination, Dr. Fahim found Plaintiff had no thyromelgaly; had regular cardiovascular rate and rhythm; had clear lungs to auscultation, bilaterally; had soft and tender abdomen; had no edema in extremities; had steady and normal gait; could walk on tiptoes and heels; had intact cranial nerves; had intact and normal motor power in upper and lower extremities, bilaterally; had intact and normal sensations in the upper and lower extremities; and had intact reflexes. Dr. Fahim found Plaintiff had decreased range of motion in his neck; tenderness over the cervical facet joints, bilaterally; a straight leg test that was fifty degrees, bilaterally; a positive Patrick's test, bilaterally; tenderness over both the

lumbar facet joints on both sides; and tenderness over both sacroiliac joints. Dr. Fahim opined that

Plaintiff's response "to the examination was exaggerated" (R. 469).

Dr. Fahim reviewed several of Plaintiff's diagnostic tests and offered the following opinions:

- April 21, 2001, MRI of lumbar spine showed degenerative disc disease, particularly affecting lower two or three lumbar vertebral levels as well as T12-L1 and L1-2, neural foraminal encroachment, no evidence for spinal canal stenosis, no definite nerve root impingement, and effacement inferiorly at L4-5, bilaterally;

- August 3, 2001, MRI of lumbar spine showed minimal diffuse disc bulge at L3-4, without significant mass effect, broad based disc bulge at L4-5, with minimal bilateral recess stenosis, and evidence of artherosclerotic change in the aorta;

- October 26, 2001, dynamic motion x-ray of lumbar spine showed minimal osteoarthritis, narrowing of L1-L2 disc space, and restricted motion on lateral bending to right;

- March 18, 2002, MRI of lumbar spine showed mild degenerative disc disease and tiny central protrusions noted at T12-L1 and L1-2;

- March 18, 2002, plain x-ray of lumbar spine showed mild degenerative changes; and

- June 3, 2002, lumbar spine CT scan and lumbar myelogram CT showed mild diffuse disc bulge at L4-5 without significant mass effect and mild disc bulge at L5-S1 without significant mass effect (R. 469).

Dr. Fahim diagnosed bilateral lumbar facet joint disease, bilateral sacroiliac joint disease,

bilateral cervical facet joint disease, degenerative disc disease of the lumbar spine, myofascial pain

syndrome of the upper and lower back, Black Lung disease, headaches, and multiple pain

complaints, including lower back pain, neck pain, and bilateral lower extremity pain (R. 469). Dr.

Fahim continued Plaintiff on the medications prescribed by Dr. Sharp, referred Plaintiff to Dr.

Sharon Joseph for a psychological evaluation, and scheduled Plaintiff for left lumbar facet joint

injections, right lumbar facet joint injections, left sacroiliac joint injections, right sacroiliac joint

injections, right cervical facet joint injections, and left cervical facet joint injections. Dr. Fahim

34

noted if Plaintiff's pain continued after the above listed series of injections, he would treat Plaintiff with lumbar epidural steroid injections (R. 470).

On March 23, 2005, Dr. Sharp corresponded with Plaintiff's counsel, informing her that Plaintiff had been diagnosed with occupational pneumoconiosis with total pulmonary function impairment by the Occupational Pneumoconiosis Board. Dr. Sharp also wrote that Plaintiff did not complete his exercise tolerance testing, administered on July 24, 2003, and October 14, 2004, by the Occupational Pneumoconiosis Board because of heart disease during the first exam and back pain during the second exam (R. 474, 475, 477).

On April 21, 2005, Dr. Sharp corresponded with Plaintiff's counsel, informing her that Plaintiff had been referred to Dr. Fahim, at the Pain Management Clinic, who had continued Plaintiff on Lorcet, Xanax, Zanaflex, Vioxx and/or Celebrex and had been giving Plaintiff trigger injections. He opined Plaintiff's pain was chronic and progressive (R. 467).

On May 19, 2005, Arturo Sabio, M.D., completed a consultative examination of Plaintiff for the West Virginia Disability Determination Service. Dr. Sabio reviewed the following of Plaintiff's medical records:

- March 19, 2002, lumbar MRI, which showed mild degenerative disc disease of the T12 and L1, L1 and L2 interspaces;

- June 3, 2002, lumbar myelogram, which showed minimal anterior epidural impression of the L3-L4 and L4-L5 interspaces;

- June 3, 2002, lumbar spine CT scan, which showed mild diffuse disc bulge at L4-5 and L5-1 interspace and no mass effect;

- December 19, 2003, chest CT scan, which showed bilateral upper lob mass compatible with progressive muscle fibrosis and no evidence of malignancy;

- Dr. Pondo's consultations notes, dated May 9 and July 11, 2003, diagnosing Plaintiff

35

with pneumoconiosis;

- April 22, 2003, bronchoscopy results, which showed no interbronchial lesions, but inflammatory changes; and

- Results from the specimen from the bronchial washing and bronchial biopsy, which showed fibrosis, chronic inflammation, and foreign material consistent with anthracosis and silicosis (R. 479-80).

Plaintiff informed Dr. Sabio that he had shortness of breath for six years and could ambulate for one-hundred yards on level ground. Plaintiff stated he could walk up an incline for 15 yards before having to "stop to catch his breath." Plaintiff was able to walk up four steps and then had to stop because of breathlessness. Plaintiff had chronic cough and frequent wheezing and used a nebulizer and inhaler, but not oxygen. Plaintiff stated he had low back pain since 2000 due to an injury he received while pulling a miner cable. Plaintiff described his symptoms as sharp pain, which radiated to his left leg; numbness from the front of the right thigh down to his knee; numbness in his toes; left leg giving out; constant aching in lumbar spine, without radiation; increased pain with repetitive bending, heavy lifting, and sitting for more than one hour; severe pain after riding in a car for more than one hour, for which he had to "step out and stretch his back"; and ambulation and weight bearing for twenty minutes increased back pain. Plaintiff stated he was told he had arthritic spurs in his spine. He informed Dr. Sabio that he had been prescribed physical therapy, but it worsened his pain. Plaintiff stated the epidural injections he received at the pain clinic did not lessen his pain (R. 480).

Plaintiff denied any cardiovascular, gastrointestinal, genitourinary, or neurological abnormalities. Dr. Sabio found Plaintiff to be alert and oriented as to time, place, and person and that he ambulated with a normal gait and was stable at station. Plaintiff did not lurch. Plaintiff's

respiration was "22 per minute and unlabored" (R. 481). Plaintiff's HEENT, neck, abdomen, and cardiovascular examinations were normal (R. 481-82). Plaintiff's chest examination revealed rhonchi all over, sighing breaths, frequent dry cough, but no rales, wheezing or cyanosis (R. 482).

Dr. Sabio's examination of Plaintiff's extremities revealed no tenderness, redness, effusion, swelling, heat, or signs of inflammation of his shoulders, elbows, wrists, or hands. There were no Heberden notes, Bouchard nodes, or rheumatoid nodules found. There was no tenderness, redness, effusion, or signs of inflammation in Plaintiff's hips, knees, or ankles. Plaintiff's femoral pulses were 2/2, symmetrical, and without bruits. His dorsalis pedis and posterior tibial arteries had strong and symmetrical pulses. Plaintiff's muscle development was symmetrical, bilaterally. He had no venous insufficiency, varicose veins, stasis ulcers, clubbing, or cyanosis (R. 482).

Plaintiff had tenderness over the second and third thoracic vertebrae and L5-S1, second, and third lumbar vertebrae. He had no kyphosis or scoliosis. Plaintiff's cervical spine range of motion was sixty degrees of flexion; 75 degrees of extension; 45 degrees lateral flexion, bilaterally; and eighty degrees rotation, bilaterally. Plaintiff's shoulder abduction was 180 degrees, bilaterally; forward flexion was 189 degrees, bilaterally; adduction was fifty degrees, bilaterally; internal rotation was forty degrees, bilaterally; and external rotation was ninety degrees, bilaterally. Plaintiff's elbow flexion was 150 degrees, bilaterally; extension was zero degrees, bilaterally; supination was eighty degrees, bilaterally; and pronation was eighty degrees, bilaterally. Plaintiff's wrist dorsiflexion was sixty degrees, bilaterally; palmar flexion was seventy degrees, bilaterally; radial deviation was twenty degrees, bilaterally; and ulnar deviation was thirty degrees, bilaterally. All Plaintiff's hand joints allowed ninety degrees of flexion and zero degrees of extension. Plaintiff's straight leg raising test was 45 degrees, bilaterally, and was restricted due to complaints

37

of pain in the lumbar spine. Plaintiff's lumbar flexion was thirty degrees forward and ten degrees laterally to either side. Plaintiff refused to "go any further" due to complaints of pain and stiffness. Plaintiff's hips had one-hundred degrees of flexion and thirty degrees of extension, bilaterally (R. 482). Plaintiff's knees had 150 degrees of flexion and zero degrees extension, bilaterally (R. 482-83). Plaintiff's ankles had twenty degrees of dorsiflexion and forty degrees of plantar extension, bilaterally (R. 483).

Plaintiff's neurologic examination revealed grossly intact cranial nerves, intact sensory function to light touch, intact pinprick, and 5/5 bilateral motor strength in upper and lower extremities. Plaintiff's deep tendon reflexes and Babinski reflexes were normal. Plaintiff could walk on his heels, on his toes, and heel-to-toe in tandem. Plaintiff could stand on either leg separately and could squat fully. Plaintiff's fine manipulation movements were normal (R. 483).

Dr. Sabio diagnosed Plaintiff with Black Lung pneumoconiosis (by history) and degenerative disk disease of the lumbar spine (R. 483).

Also on May 19, 2005, Dr. Sabio completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) of Plaintiff. He found that Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for at least two hours in an eight-hour workday; and had limited pushing and/or pulling in his lower extremities (R. 485-86). Dr. Sabio did not offer an opinion as to Plaintiff's ability to sit. Dr. Sabio found Plaintiff should never climb; could occasionally crouch, crawl, and stoop; and could frequently balance and kneel (R. 486). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 487). Dr. Sabio found, due to Plaintiff's breathing, that he should limit his exposure to dust, fumes, odors, chemicals, and gases, but not to temperature extremes, vibrations, humidity, wetness,

and hazards (R. 488)

On May 19, 2005, Plaintiff underwent a ventilatory function test at Tri-State Occupational Medicine. Plaintiff's effort was good. The pulmonary function study was normal (R. 489-90).

On June 30, 2005, Dr. Sharp completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry ten pounds or less; frequently lift and/or carry ten pounds or less; stand and/or walk for at least two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour work day and must periodically alternate sitting and standing to relieve pain or discomfort; and push/pull was limited in his lower extremities (R. 492). Dr. Sharp found Plaintiff was occasionally limited in his ability to climb ramps and stairs, balance, kneel, and crawl and could never climb ladders, ropes, scaffolds, stoop, or crouch (R. 493). Dr. Sharp found Plaintiff had no manipulative or visual limitations (R. 494). Plaintiff's communicative limitation was noted as a one percent hearing loss. Dr. Sharp found Plaintiff's exposure to noise and vibrations could be unlimited; he should avoid concentrated exposure to extreme cold and heat; he should avoid moderate exposure to wetness, humidity or hazards; and he should avoid all exposure to fumes, odors, dusts, gases, and poor ventilation (R. 495).

Dr. Sharp noted Plaintiff had pneumoconiosis, which was progressive, which caused a chronic cough, and for which he would be under the constant care of a pulmonologist. Dr. Sharp also noted Plaintiff had injuries to his lumbar, cervical, and thoracic spine, which limited his physical abilities to lift, carry, and bend. Dr. Sharp found Plaintiff would be capable of sedentary work, with limitations, "under the optimal conditions. Not Pocahontas County" (R. 498).

Administrative Hearing

Plaintiff testified at the administrative hearing that Dr. Sharp had treated his low back

condition with electrical stimulation and trigger point injections. He stated that Dr. Sharp had referred him to surgeons, but none had recommended surgery (R. 629). Plaintiff testified the trigger point injections administered by Dr. McClung "helped for a little while" and the "trigger point [injections] to block the nerve" administered by Dr. Fahim did not alleviate his pain (R. 630). Plaintiff stated the medications prescribed by Dr. Sharp for the treatment of his back pain "help[ed] a good bit." Plaintiff stated without the medication, his pain was an eight or nine on a scale of one-to-ten and a five on that scale with the pain medication. Plaintiff testified his pain was "[f]rom [his] neck clear to [his] feet" (R. 631). Plaintiff stated his pain occurred daily and that he sometimes experienced chest pain. Plaintiff stated his pain was exacerbated by over exerting himself, lifting, or walking too much. Plaintiff testified he could walk 15 yards uphill and one-hundred yards on a level surface, then he suffered severe chest and leg pain. Plaintiff stated he could stand for no more than ten or 15 minutes at a time, then his legs went numb. Plaintiff testified he had not lifted anything over ten pounds since the time of his back injury (R. 632). Plaintiff stated he rarely sat; instead, he lay down "the biggest part of the time" with ice or heat on his back. Plaintiff testified that driving, reaching, or holding the steering wheel caused severe neck pain (R. 633). Plaintiff stated he "very often" had muscle spasms, which he treated with a TENS unit, ice packs and heating pad (R. 634). Plaintiff testified he used a nebulizer machine four times a day for 15 to twenty minutes each time for treatment of his Black Lung disease (R. 635). Plaintiff stated his breathing was worsened by pollen, cold weather, dust, and cigarette smoke, exhaust, smoke, diesel fuel smoke, and perfumes (R. 636). Plaintiff testified his leg had "gotten worse" during the "past year" because pain "went clear to" his toes and they went numb (R. 639).

Plaintiff testified that he had difficulty sleeping in that he was up "at least an hour and half,

two hours every, on the hour til about six o'clock." He stated he slept best from 6:00 a.m. to 9:00 a.m., that sometimes he slept on the floor or couch, and that he was sleepy throughout the day due to medications, but he did not nap (R. 638). Plaintiff stated he watched television, read the paper, went outside, walked his dog in the yard, and sometimes helped his wife with light duty work around the house, such as vacuuming with a small vacuum cleaner and washing dinner dishes (R. 639). Plaintiff testified he could shop for ten or 15 minutes before he had to sit. Plaintiff testified that he no longer hunted, fished, or did woodworking (R. 637). Plaintiff stated he had difficulty hearing when he watched television or when several people were talking in one room (R. 638). Plaintiff stated he "hunt[ed] a little bit" on his own property, which contained 4.3 acres. Plaintiff also stated he fished "a little" and had to be accompanied by another because "of falling" (R. 640).

Vicki Shinaberry, Plaintiff's wife, testified at the administrative hearing that Plaintiff did not visit friends; no longer hunted or fished; and did not woodwork or "tinker with automobiles." Mrs. Shinaberry stated Plaintiff would accompany her to her small kitchen garden and pick a few vegetables (R. 643). Mrs. Shinaberry testified Plaintiff was depressed. She stated Plaintiff loved his former job and would still be working if he were capable (R. 643-44). Mrs. Shinaberry testified their twenty-nine year old son helped her with chores "around the house that his dad [was] not able to do," such as performing yard work and weeding on his days off from work. She stated that her son and a friend split firewood for her and Plaintiff (R. 642).

The ALJ asked VE James Pearis the following hypothetical question: "Please assume you are dealing with an individual the same age as the claimant who has the same educational background and past work experience. Further assume that the claimant retains residual functional capacity for sedentary work, with the following additional limitations. Standing at least two hours,

push-pull limited in the lower extremities, no ladders, ropes, scaffolds, stooping, or crouching, occasional climbing stairs, ramps, balancing, kneeling and crawling, avoid even moderate exposure to hazards or wetness or humidity. And avoid concentrated exposure to extreme cold or heat. . . . Could this individual perform any . . . job that exists in the local, regional, or national economy?" (R. 647). The VE testified that such an individual could perform various jobs at the sedentary, unskilled level; specifically, assembly jobs, surveillance system monitor jobs, and general office clerk jobs (R. 647-48).

Evidence Submitted During Hearing

On April 22, 2003, the results of Plaintiff's washing of his right upper lung lobe showed bronchial cells and inflammatory cells and was negative for malignancy (R. 538) (This evidence was included in the record prior to the hearing. See p. 312.)

On February 9, 2004, Dr. Carl B. Burns, completed a Reontgenographic Quality Reread of Plaintiff's January 29, 2004, x-ray for the U. S. Department of Labor. Dr. Burns commented that "med[ium] & upper lung densities may be large opacities, cannot r/o other pathology, including neoplasm." Dr. Burns recommended Plaintiff should see his personal physician (R. 535).

On May 19, 2004, Dr. Renn opined, in a Pulmonary Function Report, that Plaintiff's carboxyhemoglobin level was normal (R. 555).

Plaintiff presented to Dr. Sharp on February 2, 9, and 16, 2005, for treatment of his symptoms with a TENS unit, hot pack, OMT, and ultrasound therapy. On February 2, 2005, Plaintiff complained of lower back pain; on February 9, 2005, Plaintiff complained of ongoing neck pain, headaches, arm numbness, and low back pain; on February 16, 2005, Plaintiff complained of neck pain, headaches, arm numbness, and low back pain (R. 598-600).

On February 22, 2005, Plaintiff presented to Dr. Sharp with a productive cough and a "sore" chest. Dr. Sharp prescribed Albuterol, Singulair, and Ipratropium (R. 597). Plaintiff informed Dr. Sharp that he experienced continued lower back pain. He was treated with a TENS unit, hot pack, and ultrasound therapy. Dr. Sharp discussed Plaintiff getting treatment at the pain clinic and prescribed Lorcet, Xanax, Zanaflex, and Diclofenac (R. 596).

On March 2, 2005, Plaintiff was treated by David W. Plank, Dr. Sharp's Physician's Assistant, for pneumoconiosis. He was prescribed Accuneb, Lorcet, Singulair, Advair, Xanax, and Zanaflex (R. 595). Plaintiff was treated for lower back pain, neck pain, and headaches with TENS unit, hot pack OMT,, and ultrasound therapy (R. 594).

On March 9 and 17, 2005, Plaintiff reported low back pain to Dr. Sharp. He was treated with TENS unit, hot pack, and ultrasound therapy on March 9, 2005 (R. 592-93).

On March 22, 2005, Plaintiff returned to Dr. Sharp with complaints of a dry cough. Dr. Sharp prescribed Ipratropium, Albuterol, and Singulair (R. 591).

On March 24, 2005, Plaintiff presented to Dr. Sharp with complaints of continued low back pain. He reported he had received four facet injections on March 23, 2005, which reduced the pain in both legs and groin. Plaintiff reported he had been driving "a lot to Elkins." Plaintiff stated his neck pain and occurrence of headaches had increased. Dr. Sharp treated Plaintiff with a TENS unit and ultrasound therapy; he prescribed Lorcet and Xanax (R. 590).

On March 29, 2005, Plaintiff reported to Dr. Sharp that he experienced continued lower back pain. Workers' Compensation denied payment for Plaintiff's pain medications. Plaintiff complained of rectal bleeding; Dr. Sharp ordered Plaintiff undergo a rectal/intestinal scope. Plaintiff stated he was depressed and he had an appointment with a psychiatrist on that date (R. 589).

On April 6, 2005, Plaintiff reported he ceased taking Diclofenac and his rectal bleeding had stopped. Plaintiff stated he experienced a burning sensation in his left leg (R. 587).

On April 21, 2005, Plaintiff reported to Dr. Sharp that he experienced continued back pain. Plaintiff stated he could "do nothing after [he had] shots." Plaintiff told Dr. Sharp that his "groin [was] 'on fire'" and that sensation was "worse after shots," but that Dr. Fahim had told him this condition was "not from shots." Plaintiff stated the pain was worse in his left leg and his toes went numb. Dr. Sharp prescribed Xanax and Lorcet. He treated Plaintiff with TENS unit and ultrasound therapy (R. 585).

On April 27 and May 4, 2005, Plaintiff was treated with TENS unit and ultrasound therapy by Dr. Sharp for his low back pain (R. 582-83).

On May 11, 2005, Plaintiff was treated by Dr. Sharp for a cough. He was prescribed Nasonex and Levaquin and a chest x-ray was ordered for Plaintiff (R. 580).

On May 24, 2005, Plaintiff presented to Dr. Sharp with complaints of low back pain that radiated to his left groin area and left leg. Dr. Sharp prescribed Accuneb, Lorcet, Singular, Advair, Xanax, and Zanaflex (R. 578-79).

On May 31, 2005, Plaintiff returned to Dr. Sharp with a chronic, productive cough. Dr. Sharp ordered a chest x-ray (R. 575-76).

On June 21, 2005, Plaintiff informed Dr. Sharp that his "scrotum [was] 'on fire'" and that it "'burn[ed] all the time.'" Plaintiff stated Workers' Compensation would not pay for his medications. Dr. Sharp prescribed Lorcet, Xanax, Zanaflex, Singulair, and Albuterol (R. 574).

On July 19, 2005, Dr. Sharp examined Plaintiff and reported Plaintiff was positive for mild wheezing, dyspnea, cough, and snoring; headaches; unsteady gait; and anxiousness, depressed