IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA   **FILED**

MAR   7 2008

**U.S. DISTRICT COURT**
**CLARKSBURG, WV 26301**

JERRY L. SHINABERRY,

        Plaintiff,

v.                          CIVIL ACTION NO. 1:07CV28
                            (Judge Keeley)


COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

        Defendant.


## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules of Civil Procedure and Local Court Rule 4.01(d), on March 5, 2007, the Court referred this Social Security action to United States Magistrate John S. Kaull with directions to submit proposed findings of fact and a recommendation for disposition. On January 3, 2008, Magistrate Kaull filed his Report and Recommendation ("R&R") which also directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Rule 6(e), Fed. R. Civ. P., to file any written objections with the Clerk of Court within ten (10) days after being served with a copy of the R&R. On January 23, 2008, counsel for the plaintiff, filed objections to the R&R. On January 24, 2008, the Commissioner of Social Security ("Commissioner") filed a response to the plaintiff's objections.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

### I.   PROCEDURAL BACKGROUND

On June 3, 2003, Jerry L. Shinaberry ("Shinaberry") protectively filed an application for Disability Insurance Benefits ("DIB") alleging disability due to shortness of breath, chest pain, and lower back and leg pain.  The Commissioner denied Shinaberry's applications at the initial and reconsideration levels.  On August 9, 2005, an Administrative Law Judge ("ALJ") conducted a hearing at which Shinaberry, represented by counsel, testified. A Vocational Expert ("VE") and Vicki Shinaberry, plaintiff's wife, also testified. On December 19, 2005, the ALJ determined that Shinaberry retained the residual functional capacity to perform sedentary work.

On January 31, 2006, Shinaberry filed a Request for Review of Hearing Decision with the Appeals Council. The Appeals Council denied Shinaberry's request for review, making the ALJ's decision the final decision of the Commissioner. On March 5, 2007, Shinaberry filed this action seeking review of the final decision.

### II.   PLAINTIFF'S BACKGROUND

Shinaberry was 43 years old when he stopped working, 46 years old when he filed his application, and 49 years old at the time of

2

the administrative hearing.  He has an eleventh grade education and

past relevant work as a coal mine machine operator

### III.    ADMINISTRATIVE FINDINGS

Utilizing   the   five-step   sequential   evaluation   process

prescribed   in   the   Commissioner's   regulations   at   20   C.F.R.

§ 404.1520 (2000), the ALJ found that Shinaberry:

1.    met the  non-disability requirements  for a period  of
      disability and Disability Insurance Benefits set forth in
      Section 216(I) of the Social Security Act and was insured
      for benefits through the date of the decision;

2.    had not engaged in substantial gainful activity since the
      alleged onset of disability;

3.    had pneumoconiosis and degenerative disc disease of the
      lumbosacral spine that are considered "severe" based on
      the    requirements    in    the    Regulations    at    20    CFR
      §404.1520(c) but  do not meet  or medically equal  the
      requirements of any of the listed impairments in Appendix
      1, Subpart P, Regulation No. 4;

4.    was not totally credible in his allegations regarding his
      limitations;

5.    retained the residual functional capacity for work at the
      sedentary exertional level that may require standing for
      at   least   two   hours   out   of   eight   with   limited
      pushing/pulling in the lower extremities; no climbing of
      ladders, ropes or scaffolds; no stooping or crouching; no
      more than occasional climbing of stairs/ramps, balancing,
      kneeling, or crawling; must avoid concentrated exposure
      to temperature extremes, moderate exposure to hazards,
      wetness and humidity, and all exposure to fumes, odors,
      dusts, gases or poor ventilation;

6.  was unable to perform any of his past relevant work (20 CFR §404.1565);

7.  was considered a "younger individual" (20 CFR §404.1563);

8.  had "a limited education" (20 CFR §404.1564);

9.  had no transferable skills from any past relevant work (20 CFR §404.1568);

10. had the residual functional capacity to perform a significant range of sedentary work (20 CFR §404.1567) but has exertional limitations that do not allow him to perform the full range of sedentary work. However, using Medical-Vocational Rule 201.19 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform, such as work as an assembler, a surveillance monitor, and a general office clerk; and

11. was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §404.1520(g)).

## IV.   **PLAINTIFF'S OBJECTIONS**

In his objections to the report and recommendation, Shinaberry

alleges that the Magistrate Judge erred in accepting the ALJ's:

1.  credibility assessment and contends that the Magistrate erred in deciding that the argument "is simply comparing apples and oranges, that is claimant's back impairment and his lung impairment;"

2.  determination that he did not meet the criteria of Listing 3.02 C-3, Table III,A; and

3.  determination that Shinaberry could perform work as a general office clerk or surveillance system monitor even though the Magistrate Judge determined that the

4

                    vocational expert's findings were not totally consistent
                    with the ALJ's hypothetical.

In his response to Shinaberry's objections, counsel for the

Commissioner states that, because Shinaberry's objections are the

same issues as those contained in his summary judgment brief, he is

merely arguing that the Magistrate Judge erred when he adopted the

ALJ's findings rejecting his original arguments.

### V.  MEDICAL EVIDENCE

1.    An April 19, 2000 office note from John D. Sharp, Ph.D.,

D.O., indicating complaints of back pain radiating to the hips and

tailbone and that the injury to his back occurred either by pulling

a cable at work or by lifting a motor at home. Dr. Sharp prescribed

Vioxx and referred him to Dr. Douglas;

2.    An April 21, 2000 lumbar spine MRI report indicating

degenerative disc disease "particularly effecting [sic] lower 2 or

3 lumbar vertebral levels as well as T12-L1 and L1-2" and "no

evidence for spinal canal stenosis or nerve root impingement though

there is neural foraminal encroachment - effacement inferiorly at

the level of L-4-5 particularly on the left but also present on the

right;"

3.    An April 21, 2000 lumbar spine x-ray report indicating

"arthritic degenerative change with hyperostotic spurring" and

"some narrowing at L5-S1" and "Dextroscoliosis in the thorcolumbar area;"

    4.    An April 25, 2000 office note from Dr. Sharp indicating that Shinaberry stated he "would like to file for workers' compensation as his back injury [was] related to work" and that Shinaberry's superintendent at the mine would "let [him] go back to light duty." Dr. Sharp continued the Vioxx and began processing the paperwork for a worker's compensation claim;

    5.    An April 28, 2000 report from Richard E. Ashley, Safety Director at Spruce Fork Mine No. 1, Shinaberry's employer indicating:

> On or about April 15, 2000, Jerry Shinaberry, Continuous Miner Operator, Spruce Fork Mine #1, came into the bath house walking with difficulty before the start of his shift. I asked Jerry what was wrong, had he gotten hurt the night before? Jerry replied "I was lifting a Subaru engine and hurt my back." Jerry then said if his back did not improve soon, that he was going to the doctor.
>
> Jerry started off work on April 19, 2000. On April 27, 2000, Larry Jones, superintendent of [the mine] and Jerry came into my office. Jerry gave me a WV Workers Compensation Report of Occupational Injury. Larry asked Jerry why he was now claiming on the job injury, when Jerry had told both of us previously, that he had injured his back lifting a Subaru engine. Jerry replied that his Dr. told him the lumbar sacral strain in his back and his herniated

6

lumbar disc came from handling the miner cable
all the time.

The report further indicated that Shinaberry represented that, when

a co-worker asked him if he was going on compensation, he replied

"I have to do something, I am going to lose my house." The report

also indicated that Shinaberry's statement to Ashley, as documented

by Ashley, was:

> About 4-11-00 at about 10:00 PM my back
> started hurting while pulling miner cable. My
> back had been hurting since early in the year.
> I started going to Dr. Sharp in January and
> have been going about every (3) months since
> January.

6.   A May 9, 2000 report from Richard A. Douglas, M.D.,

F.A.C.S., indicating complaints of low back pain and bilateral

gluteal pain, right greater than left, and no leg pain or

paresthesias or weakness of the legs. Shinaberry stated that he

"presumed" he pulled a muscle on April 11, 2000 at work when he

"pull[ed] a cable into the miner" and that, when he went home, he

did additional lifting.

Examination revealed no cyanosis, clubbing, or edema of the

extremities, minimal lumbar paravertebral spasm, negative straight

leg raising test at ninety degrees, negative internal and external

rotation of femurs bilaterally, motor strength of 5/5 in all major

muscle groups, intact sensory examination, and normal cerebellar examination. After reviewing the April 21, 2000 lumbosacral spine MRI, Dr. Douglas determined that it revealed degenerative disc disease of the lumbar spine, with no disc herniation, fracture or spinal stenosis. Dr. Douglas recommended a referral to physical therapy for modalities and aquatic therapy, referral to pain management for possible trigger point injections, a total body bone scan due to history of radiation following an orchidectomy for testicular cancer, a return to clinic as needed, and no neurosurgical intervention at that time;

7.   May 22, 24, 26, and 30, 2000, and June 1, 5, 8, and 13, 2000 office notes from Dr. Sharp indicating treatment with a TENS unit, osteopathic manipulative technique ["OMT"], and ultrasound therapy;

8.   A June 16, 2000 office note from Dr. Sharp indicating treatment with a TENS unit, OMT and ultrasound therapy for back pain.   Shinaberry stated that he could not bend his neck and he could not stand for long periods. Dr. Sharp prescribed Vioxx, Lorcet, and Xanax;

9.    June 20, 27, and 29, 2000, and July 6, 11, and 13, 2000 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

10.   A July 18, 2000 office note from Dr. Sharp indicating continued back pain and a report from Shinaberry that the regular pain medication "[did] something" to alleviate it. Shinaberry also reported that his buttocks were numb, he could not sit and that mowing the grass exacerbated his pain. Dr. Sharp prescribed Lorcet, Vioxx and Xanax;

11.   July 25 and 27, 2000, and August 3 and 8, 2000, office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

12.   An August 17, 2000 office note from Dr. Sharp indicating a complaint of "bad days" due to pain.  Dr. Sharp prescribed Lorcet and Xanax and provided samples of Vioxx;

13.   An August 29, 2000 office note from Dr. Sharp indicating a complaint of severe back pain due to working on a truck.  Dr. Sharp provided treatment with a TENS unit, hot packs, OMT and ultrasound therapy on this date, and also on August 31 and September 7, 2000;

14. A September 13, 2000 office note from Dr. Sharp indicating "popping" in his [Shinaberry's] back and that the pain was getting lower and worse, that he woke every two to three hours due to pain, and that he was "trying to walk some" but could not walk up hills. Dr. Sharp prescribed Lorcet and Vioxx and continued treatment with TENS unit, hot packs, OMT and ultrasound therapy;

15. November 2, 7, 14, 16, 28, and 30, 2000, and December 5, 7, 12, and 14, 2000 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy as well as prescriptions for Xanax and Lorcet;

16. A November 7, 2000 letter from Dr. Sharp to Richard Cardos, Shinaberry's attorney, regarding Shinaberry's worker's compensation claim indicating:

> As I said before, (I think) that Jerry Shinaberry has pulled his low back lifting on a motor but he did continue to work. He then injured his back pulling a cable etc. in the coal mines. The "straw that broke the camels back" was the incident in the coal mine, which should be a compensable injury. I hope this can be cleared soon so that Mr. Shinaberry will be able to receive the proper appropriate medical care to repair his back in order for him to return to work as a productive citizen;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

17.   December 21, 2000, and January 2 and 4, 2001 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

18.   A January 5, 2001 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy. Examination revealed clear lungs to auscultation and negative straight leg raising at seventy degrees on the left and eighty-five degrees on the right. Shinaberry reported he had "slip[ped] a little on ice," and twisted his back.  He further reported that he was "getting depressed waiting on" workers' compensation to decide his claim;

19.   January 9, 11, 16, 18, and 30, 2001, February 1, 6, 8, 13, 15, 20, 22, and 27, 2001, and March 1,  2, 8, and 13, 2001 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy for continuing complaints of low back pain and pain in hips and legs;

20.   A March 14, 2001 office note from Dr. Sharp indicating complaints of being "stiff all over" and having severe pain in low back and hips.  Examination revealed reduced range of motion and reduced neck abduction/adduction. Dr. Sharp diagnosed chronic low

back pain and provided treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

21. April 10 and 13, 2001 office notes from Dr. Sharp indicting treatment with a TENS unit, hot packs, OMT and ultrasound therapy, as well as complaints of inability to sleep, depression and numbness and pain radiating to legs and knees;

22. A May 1, 2001 report from a bone scan indicating "minor degenerative change", "[n]o evidence of metastatic deposit," and "no minor degenerative type activity over the major joints;"

23. A May 7, 2001 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy, a review of the May 1, 2001 bone scan, which Dr. Sharp considered to be normal, and complaints from Shinaberry that he was "overall getting worse" because he could not bend forward and that the trip to Lewisburg, West Virginia "killed" him. Dr. Sharp referred Shinaberry to a Charleston, West Virginia pain clinic, and noted that he was considering physical therapy treatment;

24. A May 14, 2001 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy. Shinaberry reported he was "fair", had been "trying to turkey hunt" and had been walking;

25.  May 17 and 22, 2001 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy, as well as a prescription on May 22, 2001 for Lorcet and Xanax;

26.  May 24 and 30, 2001, and June 5, 12, and 17, 2001 office notes from Dr. Sharp indicating treatment with TENS unit, hot packs, OMT and ultrasound therapy;

27.  A June 19, 2001 office note from Dr. Sharp indicating complaints of sleeplessness due to pain, inability to lift more than ten to fifteen pounds, and continuous pain radiating down both legs.  Examination revealed negative straight leg raising test at sixty degrees on right and seventy degrees on the left.  Dr. Sharp noted that Shinaberry was waiting for approval from workers' compensation for treatment at the pain clinic;

28.  June 21, 26, and 28, 2001, and July 3, and 5, 2001 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

29.  A July 9, 2001, office note from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy for his back pain, as well as complaints of inability to bend or

pick up anything, inability to sleep, continual pain and pain radiating to his back and to his right hip;

30. A July 16, 2001 letter from Dr. Sharp to West Virginia Workers' Compensation Division noting that he had been treating Shinaberry since April 19, 2000 for low back pain, that Shinaberry had been temporarily and totally disabled since the injury on April 19, 2000, and seeking authorization for a referral to Raymond Harron, M.D., a neurosurgeon in Roanoke, Virginia, and referral for a MRI;

31. July 17, 19, 24, and 31, 2001 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

32. An early September, 2001 office note from Dr. Sharp indicating complaints of pain and numbness in the right leg, inability to sleep, attempts to walk and prescriptions for Vioxx, Lorcet and Xanax;

33. A September 13, 2001 neurosurgical consultation report from A.E. Landis, M.D., who reviewed various medical records and then performed an IME. Dr. Landis' examination revealed:

> 45 year old male of Japanese ancestry stands 5
> ft 7 in. tall, weighs 182 lbs. He is well
> developed, well nourished, healthy, alert, in
> no distress. He moves well without any

14

restriction. He does not limp. He is able to undress and dress without any assistance. He is able to get on and off the exam room table without any difficulty. Range of motion assessment results in flexion 30 degrees; extension 15 degrees; right and left side bending 20 degrees in each direction. He complains of central localized low back pain on all ranges of motions without any radicular component. There is no evidence of any spasm of the paravertebral muscles. There is no deformity of the lumbar spine. There is no localized tenderness. Heel and toe walking are done without difficulty. Straight leg raising in the sitting position at 180 degrees of knee extension; 90 degrees of hip flexion causes low back pain bilaterally without sciatic radiation. Straight leg raising in the supine position to 45 degrees bilaterally causes low back pain without sciatic radiation. Neurological examination reveals no motor weakness or muscle atrophy in any major muscle group in either lower extremity. The thighs measure 51 cms in the mid thigh region bilaterally at comparable levels. The calves measure 39 cms, in the mid calf region bilaterally at comparable levels. Sensory examination is intact throughout both lower extremities except for decreased sensation over the anterior lateral right thigh which he describes as a tingling sensation only in the distribution of the anterior lateral femoral cutaneous nerve. Deep tendon reflexes reveal the knee jerks to be 2+ and equal. The ankle jerks are likewise 2+ and equal. Reflexes are brisk and symmetrical.

X-RAYS: Lumbosacral spine series with outside films in AP and lateral projection with obliques and spot lateral view taken here in the clinic show degenerative lipping at L1-L2, as well as at L4 on the AP view without

any scoliosis. The lateral view shows diffuse degenerative lipping throughout the lumbar spine with minimal narrowing at the L5-S1 level. The oblique views taken today show diffuse degenerative osteophytic lipping at the superior aspect of most levels. There are also degenerative changes in the facet joints at l5-S1. The pars interarticularis are intact at all levels.

Review of his MRI Scan taken previously shows minimal degenerative disc

DISCUSSION: It is my impression that Mr. Shinaberry sustained a strain/sprain type of injury to his lower back as a result of the work related incident noted above. The injury was superimposed on some pre-existing degenerative changes which may have been aggravated by the injury. He has undergone extensive treatment with electrical stimulation, ultrasound and osteopathic manipulation without any appreciable benefit. However, his treatment has not been altered to any great extent over the course of the last year and a half. At this point, I feel that the claimant would probably benefit from aggressive stretching exercise program for his back under the supervision of a qualified physical therapist. His Vioxx should be re-instated 25 mgs. to 50 mgs. a day. It is my opinion that he should be taken off the Lorcet 10/650 and placed on a milder analgesic, such as Ultram. Possibly even Tylenol would benefit him along with the Vioxx. I find no evidence of any radiculopathy at this time. It is not likely that any injection therapy is going to be of any benefit to him. Another factor that has to be considered is the closing of his mine last summer and the fact that he does not have a job to return to. If he is going to be referred to a pain management clinic, then he

> should be referred to a multi-disciplinary
> program, such as Oasis Program, though maybe
> one closer to his home. I would suggest re-
> evaluation to determine his impairment in
> another 4 to 6 months, at which point he
> should have reached maximum degree of medical
> improvement;

34. An October 3, 2001 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy;

35. An October 9, 2001 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy due worsening back pain, numbness from his hip to his knee, and pain in his groin area;

36. An October 25, 2001 office note from Dr. Sharp indicating that Shinaberry stated that Vioxx upset his stomach, that he had pain in his groin area and that it was difficult for him to stand;

37. An October 26, 2001, office note from Dr. Sharp indicating inability to sleep. Dr. Sharp recommended that Shinaberry begin physical therapy and he refilled Shinaberry's prescriptions for Vioxx and Lorcet;

38. A January 8, 2002 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy;

39. A January 16, 2002, office note from Dr. Sharp indicating complaints of moderate to severe pain and soreness in his spine,

episodes of entire back hurting, inability to bend to pick up anything and difficulty putting on his shoes. Shinaberry stated that he believed physical therapy had made his condition worse. Examination revealed negative straight leg raising test at sixty degrees on the right and eighty-five degrees on the left. Dr. Sharp prescribed a home TENS unit and Vioxx;

40. A March 18, 2002 lumbar spine x-ray report indicating minor disc space narrowing at T12-L1 and L1-2, mild marginal spurring, no fracture or focal bony destruction, no subluxation and an impression of "mild degenerative change";

41. A March 18, 2002 lumbar spine MRI report indicating "mild degenerative disc disease and tiny central disc protrusions noted at T12-L1 and L1-2" and "no other significant abnormalities . . . and . . . no demonstrable metastatic disease;"

42. A May 8, 2002 letter from Raymond V. Harron, D.O. indicating "no real significant change in his [most recent MRI] study in comparison from the [MRI] study of 2000," and noting "some degenerative changes up at the T12-L1 and L1-L2 region [and] L4-L5 level." His examination was essentially normal and Dr. Harron recommended a myelogram and post-myelographic CT scan of the lumbar spine and lower thoracic spine for further evaluation;

43. A June 3, 2002 lumbar myelogram CT scan report indicating:

> At L2-3 there is no disc bulge or foraminal stenosis. Minimal discogenic spurring is seen anteriorly;
>
> At L3-4 there is no significant disc bulge or foraminal stenosis;
>
> At L4-5 there is minimal broad based bulge without associated mass effect or nerve impingement;
>
> At L5-S1 there is minimal central disc protrusion without associated mass effect;

44. A June 10, 2002 letter from Dr. Landis to Workers' Compensation indicating Shinaberry was in no distress, moved without restriction, did not limp, could dress and undress and get on and down from the examination table without difficulty. Examination revealed range of motion was forward flexion forty degrees, extension fifteen degrees, right side bending twenty degrees, left side bending twenty-five degrees, with complaints of pain and no radiation, no spasm, could heel and toe walk without difficulty, had some tenderness to palpation at L5-S1, sitting straight leg raising test was 180 degrees, supine straight leg raising test was forty-five degrees due to pain without radiation, and had no motor weakness in the lower extremities.

19

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Dr. Landis further indicated:

DISCUSSION: It is my impression that Mr.
Shinaberry sustained a simple strain/sprain
type of injury to his lower back region in the
work related incident noted above. The injury
was superimposed on some mild degenerative
changes with MRI Scan showing degenerative
disk changes at L4-L5 and L5-S1 but no
evidence of disc herniation. He has had
neurosurgical evaluations by Dr. Crowe and Dr.
Harron, neither of whom found any evidence of
radiculopathy or localizing neurological
findings. Recent myelogram/post myelogram CT
Scan again showed mild degenerative bulging
without disc herniation at any level. He is
now over two years post injury. He has had
appropriate extensive, adequate, conservative
treatment without any benefit. He obviously
has reached maximum degree of medical
improvement from this soft tissue
strain/sprain injury. He does not require any
additional treatment, though he should be
allowed to continue conservative treatment
with followup with his family physician every
three months to obtain his medications. The
only thing I would suggest is that he be tried
on another nonsteroidal anti-inflammatory
medication that does not cause any GI
symptoms. He is no longer temporarily totally
disabled and certainly capable of performing
at least light to sedentary type work. Based
on the A.M.A. Guides to Impairment Rating
Fourth Edition, employing the Range of Motion
Model, as required by the Office of Judges,
the claimant's range of motion measurements do
not pass the validity criteria, besides that,
he restricts his range of motion due to pain.
Therefore, it is not appropriate, according to
the A.M.A. Guides to use range of motion
measurements to assess impairment. However, in
order to satisfy the Office of Judges'

> requirements for use of this method, Table 75
> is employed, placing him in Category II-B,
> which allows for a 5% whole-man impairment.
> DRE Method would also allow for 5% whole-man
> impairment, placing him in DRE Category II.
> The claimant's condition is not expected to be
> progressive.     He   does   not   require
> rehabilitation services;

45.  A June 26, 2002 letter from Dr. Harron to Dr. Sharp indicating that he had reviewed the lumbar myelogram and post-myelographic CT scan and found mild disc bulging at L4-L5 and L5-S1, but no nerve root or spinal cord compression. Dr. Harron did not recommend any surgery and felt that he should be treated conservatively for his pain;

46.  A July 2, 2002 office note from Dr. Sharp indicating tenderness at his L1-2 area, and a complaint from Shinaberry that he could not "do anything." Dr. Sharp provided treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

47.  A July 18, 2002 office note from Dr. Sharp indicating Shinaberry reported that "driving kill[ed]" him, and that he could not perform yard work or operate a chain saw;

48.  An August 26, 2002 office note from Dr. Sharp indicating complaints of back, tailbone and groin pain and inability to sit after driving to Elkins and back home. Dr. Sharp provided treatment with a TENS unit, hot pack, OMT and ultrasound therapy;

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

49. A September 17, 2002 office note from Dr. Sharp indicating complaints of pain down the back of his right leg to his ankle and spasms in his mid back. Treatment included a TENS unit, hot packs, OMT and ultrasound therapy. Dr. Sharp provided Celebrex samples and prescribed Lorcet, Xanax and Zanaflex;

50. A September 18, 2002 office note from Dr. Sharp indicating complaints of continuing groin pain and back pain that radiated to his hips. Shinaberry stated he had a "knot on [right] side [of] back [at] S1" and had pain in his groin to his ankle when he tried to cut firewood. Examination revealed straight leg raising test was forty degrees on the right and sixty degrees on the left;

51. An October 16, 2002 report from Charles McClung, D. O., McClung Health & Wellness Center, indicating review of lumbar myelogram which was negative for Foraminal increment. Dr. McClung noted that the MRI revealed bulging disks L1, 2, 4, 5 and T12. He diagnosed work-related lower thoracic and lumbar sprain with soft tissue injury and recommended treatment with ligament injections to the lower thoracic and lumbar spine every two weeks for a four-month period along with aggressive physical therapy and continued heat, ice and tinge [sic] unit;

52.   An October 22, 2002 office note from Dr. Sharp indicating complaints of severe pain in his right leg, numbness, groin pain, severe muscle spasms in his right back, and inability to bend forward to pick up anything from the floor. Treatment included a TENS unit, hot pack, OMT and ultrasound therapy.   Dr. Sharp prescribed Lorcet, Xanax and Zanaflex;

53.   An October 30, 2002 office note from Dr. Sharp indicating continued complaints of back pain and that bending over the day before caused the pain to become "severe."   Dr. Sharp diagnosed "low back chronic pain;"

54.   A November 7, 2002 office note from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy. Shinaberry reported that the Vioxx was not "helping" relieve his pain;

55.   A November 18, 2002 office note from Dr. Sharp indicating Shinaberry reported that his low back pain continued, that rehabilitation therapy was making his condition worse, that he was not sleeping, that his right leg was numb, and that he still had pain in his groin. He received treatment with a TENS unit, a hot pack, OMT and ultrasound therapy;

23

56. A December 4, 2002 office note from Dr. McClung indicating that Shinaberry had received a ligament injection and reported that he had suffered back spasms on the left side and had had no relief of his pain;

57. A December 10, 2002, office note from Dr. Sharp indicating that Shinaberry's back pain was worse and that he had muscle spasms. He was treated with a TENS unit, hot pack, OMT and ultrasound therapy. Dr. Sharp prescribed Lorcet, Xanax and Vioxx;

58. A December 19, 2002 office note from Dr. McClung indicating that Shinaberry received another injection;

59. A January 8, 2003 office note from Dr. McClung indicating that Shinaberry had stated the previous injection had "helped for 1 to 1 ½ days" and that he experienced lower back pain on both sides of his spine. Shinaberry received another injection;

60. January 9, 16, and 23, 2003 office notes from Dr. Sharp indicating Shinaberry had complained of continued back pain and had received treatment with a TENS unit, a hot pack, OMT and ultrasound therapy;

61. A January 22, 2003 office note from Dr. McClung indicating that Shinaberry reported he "felt good [for] 3 days past injections." Shinaberry received another ligament injection;

62.  A January 27, 2003 office note from Dr. Sharp indicating Shinaberry's pain was "bad again," his "back muscles [were] hard as knots," and he was "ok" if he did not do anything, but "down 3 days" if he did.  Dr. Sharp recommended that Shinaberry participate in physical therapy and work hardening. Treatment included a TENS unit, hot pack, OMT and ultrasound therapy and prescriptions for Zanaflex, Xanax and Vioxx;

63.  A February 12, 2003 office note from Dr. McClung indicating Shinaberry reported that his previous injection caused "a lot [sic] of pain & muscle spasms [for] 2 weeks" and that he had been doing better until he trimmed trees. Shinaberry received ligament injections on February 12, 2003 and March 5, 2003;

64.  A March 14, 2003 chest x-ray indicting "interstitial fibrosis with progressive mass of fibrosises [sic] highly consistent with a coal worker's pneumoconiosis";

65.  A March 14, 2003 pulmonary function test indicating "mild restriction", a predicted FVC of 4.58 liters and an actual reading of 3.36 (73.44% of predicted), 3.22 (70.33% of predicted) and 3.18 ( 69.40% of predicted), a predicted FEV-1 of 3.74 liters and actual readings were 2.56 (68.58% of predicted), 2.67 (71.41% of predicted), and 2.63 (70.51 of predicted;

66.   A March 19, 2003 office note from Dr. McClung indicating Shinaberry had experienced increased pain due to driving his car for two hours.  Dr. McClung noted reduced swelling of the low back muscle. Shinaberry reported that the previous injection provided pain relief for two days. He received another ligament injection;

67.   A March 25, 2003 office note from Dr. Sharp indicating Shinaberry complained of continued back pain, numbness down the right leg to his knee and muscle spasm in his thoracic spine. Shinaberry reported that a "knot came out on [his] spine" and "went away [by his] using heat & ice";

68.   A March 28, 2003 office note from Dr. McClung indicating Shinaberry reported "a lot" of relief on the left side from his previous injection but had an "episode" on the right side with bad numbness;

69.   A March 31, 2003 office note from Dr. Sharp indicating he had treated Shinaberry with a TENS unit, a hot pack, OMT and ultrasound therapy and prescribed Lorcet, Vioxx and Xanax. Shinaberry reported the ligament injections were "helping some";

70.   An April 7, 2003 office note from Dr. McClung indicating Shinaberry had received an epidural lumbar injection and that Shinaberry had reported that the last injection provided relief for

26

seven days and had helped relieve the spasms. Shinaberry also reported he "tried to run power saw;"

71. An April 8, 2003 office note from Dr. Sharp indicating Shinaberry had complained of continued back pain, chest pain, and shortness of breath;

72. An April 10, 2003 office note from Dr. Sharp indicating treatment with a TENS unit, a hot pack, OMT and ultrasound therapy. Based on his review of Shinaberry's chest x-ray, Dr. Sharp noted that there may be a mass in the right upper lobe and referred Shinaberry to a pulmonologist. Dr. Sharp noted that Shinaberry's EKG was normal;

73. Office notes for April 15 and 16, 2003 from Dr. Sharp indicating he had treated Shinaberry with a TENS unit, a hot pack, OMT and ultrasound therapy;

74. An April 16, 2003 office note from Dr. Sharp indicating that he completed a Physician's Report of Occupational Pneumoconiosis for West Virginia Workers' Compensation Fund. The report noted that he had begun treating and examining Shinaberry for pneumoconiosis on March 14, 2003, that Shinaberry had never had pneumonia, pleurisy, asthma, tuberculosis, angina pectoris, coronary occlusion, rheumatic heart disease, congestive heart

failure, or arthritis, that Shinaberry's current complaints were dry cough for five years, shortness of breath (worse with exertion) for five years, wheezing (with exertion) for five years, and orthopnea. Dr. Sharp indicated that Shinaberry had coarse breath sounds, had chest pain and shortness of breath that increased with normal exercise, and that Shinaberry's "SOB and sweats had increased over the past year";

75. An April 17, 2003 "Routine Abstract Form – Physical" of Shinaberry from Jaroslaw Pondo, M.D. indicating normal gait, station, fine motor ability, gross motor ability, joints, muscle bulk, ranges of motion, reflexes, sensory deficits, motor strength, coordination, and mental status, cardiovascular examination, dyspnea, with exertion, orthopnea, cyanosis, and edema, digestive system, and abnormal breath sounds. Dr. Pondo's assessment was pneumoconiosis;

76. An April 17, 2003 chest CT scan indicating "pneumoconiosis, denser and more massive on the right";

77. An April 21, 2003 Vocational Progress Report from the State Division of Rehabilitation Services indicating:

> Right now Jerry is very concerned about the nature and the extent of his lung problem and treatment options, which undoubtably will affect his return to work potential. He has

28

> shortness of breath with minimal exertion. He
> is equally limited by his pulmonary and his
> musculoskeletal conditions. A return to work
> in the coal mines is looking less and less
> likely. He has earned very good wages and
> lacks the education and skills to obtain more
> sedentary and undoubtedly more technical and
> clerical types of work that would provide
> commensurate wages. In addition, he lives in
> a very rural area where employment options are
> very limited and he does not want to relocate.
> Improvement in physical functioning and
> improvement in academic achievement are
> critical to successful return to work.

The report further noted a plan for Shinaberry's continued

treatment with Dr. McClung to decrease pain and muscle spasm, and

that upon completion of the treatment a functional capacity

evaluation would be performed to define his abilities and

limitations and compare them with the physical requirements of his

pre-injury job. Shinaberry was to continue with GED classes and

participate in vocational training through DRA to identify his

aptitudes and abilities should a job change or a change in vocation

be necessary;

78. An April 22, 2003 "short stay record" from Davis Memorial

Hospital indicating a diagnosis of pneumoconiosis;

79. An April 22, 2003 x-ray report from Davis Memorial

Hospital indicating no pneumothorax and no pneumomediastinum.

Shinaberry also had a right upper lobe lung washing that revealed

no malignancy. The biopsy of his right upper lobe of his lung showed "bronchial mucosa with fibrosis, chronic inflammation, and deposition of both polarizable and non-polarizable foreign material consistent with anthracosis and silicosis;"

80.  An April 23, 2003 office note from Dr. Sharp indicating complaints of continued chronic back pain, numbness in his arm, and treatment with a TENS unit, hot pack, OMT and ultrasound therapy;

81.  An April 30, 2003 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy for reported pain between his shoulders to his neck and shortness of breath with exertion. Dr. Sharp prescribed Lorcet, Vioxx, Xanax and Zanaflex;

82.  May 5, 14, 23, and June 2, 2003 office notes of Dr. McClung indicating complaints of significant pain and receipt of ligament injections;

83.  A May 6, 2003, office note from Dr. Sharp indicating that, after Dr. McClung performed manipulation therapy on May 5, Shinaberry "felt something catch in [his] back." Dr. Sharp provided treatment with a TENS unit, hot pack and ultrasound therapy;

84.  A May 9, 2003 procedure report from a bronchoscopy performed by Dr. Pondo indicating a diagnosis of pneumoconiosis and silicosis. Examination revealed  supple neck and chest clear to auscultation, no clubbing, cyanosis, or edema in his extremities and that Shinaberry was neurologically  intact;

85.  A May 15, 2003 office note from Dr. Sharp indicating that Shinaberry had received a ligament injection to his spine on May 14, 2003 and had reported that it was "helping" his back pain, treatment with a TENS unit, hot pack, OMT and ultrasound therapy, and a referral to TriState Occupational Rehabilitation;

86.  A May 22, 2003 office note from Dr. Sharp indicting that Shinaberry reported his low back pain continued but that the ligament injections were "helping", and treatment with TENS unit, hot pack, OMT and ultrasound therapy;

87.  A May 27, 2003 office from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy;

88.  A June 3, 2003 office note from Dr. Sharp indicating a ligament injection on June 2, 2003. Shinaberry reported that he had developed neck pain about one and one-half months ago, had received manipulation therapy from Dr. McClung, but reported pain between his shoulders and into his neck that caused severe headaches.  He

stated his neck "grind[ed] and pop[ped]" and was "tight." Dr. Sharp prescribed Toradol, Lorcet, Medrol DosePak and Percocet;

89. A June 11, 2003 office note from Dr. McClung indicating Shinaberry had reported neck pain, stating that his last injection "helped" for three days. Shinaberry received another injection;

90. A June 12, 2003 office note from Dr. Sharp indicating Shinaberry continued to have neck pain and headaches. Sharp instructed him to treat his symptoms with a home TENS unit and scheduled an appointment with TriState Occupational Rehabilitation for June 20, 2003;

91. A June 24, 2003 office note from Dr. Sharp indicating Shinaberry complained of constant low back pain and neck pain, inability to change a flat tire by himself, and that he had received treatment with a TENS unit, hot pack, OMT and ultrasound therapy;

92. A July 1, 2003 office note from Dr. Sharp indicating Shinaberry had increased cervical pain, had received treatment with a TENS unit and hot pack to the neck, and had been prescribed Lorcet, Vioxx and Xanax;

93. A July 9, 2003 office note from Dr. McClung indicating that Shinaberry did not want additional injections to his neck

because they caused soreness, that his previous ligament injection provided relief from back pain for fourteen days, and that he received a lumbar injection;

94.  A July 11, 2003 office note from Dr. Pondo indicating that Shinaberry did not have "any shortness of breath more than usual", experienced "on and off" chest pain and no hemoptysis. Examination revealed that his chest was clear to auscultation, his heart rate was regular, he had no clubbing, cyanosis, or edema, his neurological examination was intact, and a diagnosis of pneumoconiosis/silicosis;

95.  A July 18, 2003 office note from Dr. McClung indicating that Shinaberry's previous injection had "helped for a few days," but Shinaberry had experienced neck, low back, and groin pain.  He administered a ligament injection to Shinaberry;

96.  A July 21, 2003 office note from Dr. Sharp indicating that Shinaberry reported falling on a concrete floor and injuring his neck.  Dr. Sharp provided treatment with a TENS unit, hot pack, OMT and ultrasound therapy, prescribed Percocet and referred Shinaberry to a pain clinic in Charleston, West Virginia;

97. A July 23, 2003 office note from Dr. Sharp indicating Shinaberry had received treatment with a TENS unit, hot pack, OMT and ultrasound therapy and a prescription for Toradol;

98. A July 24, 2003 pulmonary function study report from Occupational Lung Center for the West Virginia Occupational Pneumoconiosis Board indicating that the test was performed while resting and only with pre-bronchodilator due to heart disease, that the spirometry ranged from fifty-three to eighty-five percent of predicted value, that diffusion ranged from sixty and eighty-nine percent of predicted value;

99. A July 28, 2003 office note from Dr. McClung indicating that Shinaberry's injections were "helping the back some" and that he had administered another injection to Shinaberry;

100. A July 31, 2003 office note from Pocahontas Medical Clinic indicating Shinaberry had complained of cough, chest congestion, sinus drainage, and temperature and had received prescriptions for Levaquin, Atrovent, Albuterol and Advair;

101. An August 5, 2003 office note from Dr. Sharp indicating he had treated Shinaberry with a TENS unit, hot pack and ultrasound therapy, and had completed a Routine Abstract Form Physical for the Disability Determination Section of the State of West Virginia. On

the form, Dr. Sharp noted a diagnosis of COPD, Black Lung disease,

lumbosacral strain, lumbar disc disease and "c-strain", respiration

of sixteen and walking with a limp, abnormal vision, normal hearing

and speech, normal joints, abnormal gait and station due to limp,

abnormal fine motor ability, abnormal gross motor ability, abnormal

ranges of motion both left and right, and abnormal right lower

extremity's muscle bulk, abnormal right lower extremity reflexes,

abnormal sensory deficits, abnormal motor strength, abnormal

coordination, abnormal frequency of seizures and/or blackouts, and

abnormal mental status due to depression, normal respiratory

functions of cyanosis and edema, abnormal breath sounds, orthopnea,

and dyspnea (with exertion and at rest), normal heart sounds,

extremities, and circulation, no evidence of congestive heart

failure and normal digestive system.  Dr. Sharp also noted

Shinaberry experienced chest pain due to his lungs, pneumonia and

chronic cough.

Dr. Sharp further indicated that Shinaberry received

injections from Dr. McClung, that he had been examined for Black

Lung disease, that he experienced chronic pain in his lumbar spine,

and that he had right sciatic neuralgia, right leg numbness and

headaches.  Dr. Sharp determined Shinaberry was unable to bend,

lift, sit or ride for over twenty to thirty minutes, was "unable to engage in any physical exercise" was "functionally limited" in "physical exercise and sitting", and was able to drive only 30-40 minutes with rest;

102. An August 13, 2003 office note from Dr. Sharp indicating he had treated Shinaberry with a TENS unit, hot pack, OMT and ultrasound therapy;

103. An August 18, 2003 office note from Dr. Sharp indicating Shinaberry continued to receive ligament injections and that Shinaberry stated these had "help[ed]" his low back pain but he had continued pain in his neck, pain in his right side, and numbness in his fourth and fifth right digits and had a tender cervical spine;

104. An August 25, 2003 office note from Dr. McClung indicating Shinaberry had "improved mobility" in his "L/S spine" and that Shinaberry had reported that the last injection had "done good;"

105. An August 26, 2003 office note from Dr. Sharp indicating Shinaberry reported that the ligament injection on August 25, 2003 caused his back to feel "better". Dr. Sharp prescribed Lorcet, Vioxx and Xanax;

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

105. A September 4, 2003 office note from Dr. Sharp indicating complaints of continued back pain, a tender lumbar spine, loss of lordosis, loss of range of motion, painful range of motion, painful flexion, extension and lateral rotation. He treated Shinaberry with a TENS unit, hot pack, OMT and ultrasound therapy and prescribed Lorcet, Vioxx and Xanax;

106. A September 10, 2003 Physical Residual Functional Capacity Assessment indicating Shinaberry could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, had unlimited ability to push/pull, was frequently limited in his ability to climb, balance, stoop, kneel, crouch, and crawl, had no manipulative, visual, or communicative limitations, had no limitations regarding exposure to extreme cold and heat, wetness, humidity, noise, vibration, and hazards, and should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation;

107. September 11 and 16, 2003 office notes from Dr. Sharp indicating Shinaberry had been treated with a TENS unit, hot packs and ultrasound therapy;

108. A September 24, 2003 letter from Dr. Sharp to the West Virginia Workers' Compensation Division seeking approval for payment for pulmonology evaluations, a chest CT scan, endobronchial scoping, a PET scan, and prescriptions for Singulair and Albuterol based on recent x-rays showing increased densities in his lungs when compared to the 1998 x-rays. Dr. Sharp noted Singulair and Albuterol "help[ed] [Shinaberry] to breath more easily;"

109. October 2, 10, and 16, 2003 office notes from Dr. Sharp indicating he had treated Shinaberry with a TENS unit and hot pack, and had prescribed Lorcet, Vioxx, Xanax and Zanaflex;

110. October 9, 20, and 29, 2003 office notes from Dr. McClung indicating that Shinaberry reported ligament injections had helped his pain and/or spasms;

111. An October 16, 2003 letter from Dr. Sharp to the West Virginia's Workers' Compensation Division requesting authorization for treatment due to an acute lower respiratory infection. Dr. Sharp noted that the x-ray revealed Shinaberry had pneumonia, not mycloplasm, of his left lung, was positive for rales and rhonci and had been treated with injections of Claforan, DepoMedrol, and Vitamin B12 and had been provided samples of Avelox;

38

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

112. An October 21, 2003 office note from Dr. Sharp indicating his treatment of Shinaberry with a TENS unit, hot pack, OMT and ultrasound therapy;

113. An October 23, 2003 PET scan report indicating "findings most consistent with pneumoconiosis/silicosis" and "no evidence for extra thoracic abnormal uptake;"

114. An October 30, 2003 office note from Dr. Sharp indicating complaints by Shinaberry of continued back pain, numbness in his right leg to his knee "all the time". Dr. Sharp treated Shinaberry with a TENS unit and a hot pack and prescribed Lorcet, Vioxx and Xanax;

115. A November 8, 2003 office note from Dr. McClung indicating that Shinaberry reported his sciatic nerve was much better, but he still experienced back pain. Shinaberry received an injection;

116. A November 10, 2003 office note from Dr. Pondo indicating that Shinaberry's PET scan was "positive in the lungs, [m]asses no extra thoracic uptake," which was consistent with inflammation. He diagnosed pneumoconiosis and prescribed Prednisone;

117. A November 11, 2003 letter from James E. Bland, M.D., to Workers' Compensation Fund indicating that "the four frequency

totals of 100 in the right ear and 105 in the left ear would obtain a 0% wholeman impairment award. One percent would be indicated for any speech discrimination deficits, making a total bilateral wholeman impairment award of 1.0%;"

118. A November 12, 2003 office note from Dr. Sharp indicating Shinaberry reported continued back, neck and shoulder pain and had received treatment with a TENS unit, hot pack and ultrasound therapy. Shinaberry reported he had received an injection from Dr. McClung that did not "help numbness & pain . . . ;"

119. November 19 and 25, 2003 and December 3, 2003 office notes from Dr. Sharp indicating treatment with TENS unit, hot pack, OMT and ultrasound therapy and prescriptions on December 3, 2003, for Vioxx, Xanax and Lorcet;

120. A November 20, 2003 office note from Dr. McClung indicating Shinaberry reported some pain in his groin and some swelling in his lower back after the last injection and that all of sciatic nerve pain was gone. Shinaberry received another injection;

121. A December 3, 2003 letter from Dr. Sharp to the West Virginia Workers' Compensation Division, requesting approval for Singulair and Albuterol based on Shinaberry's continued shortness of breath and occasional lung pain. Dr. Sharp noted that both of

these medications "help[ed] to ease [his] discomfort and enable[d] him to breathe easier;"

122. A December 8, 2003 office note from Dr. McClung indicating Shinaberry had received a ligament injection;

123. A December 11, 2003 office note from Dr. Pondo noting the same results as the November 10, 2003 examination and a diagnosis of "pneumoconiosis/massive" and progressive fibrosis. Dr. Pondo ordered a CT scan to evaluate Shinaberry's response to the Prednisone;

124. A December 19, 2003 chest CT scan indicating an impression of bilateral upper lobe mass compatible with progressive massive fibrosis that was relatively stable in appearance over the past eight months, a slight decrease in inflammation of the perihilar regions, as compared with a prior study and no changes suggestive of malignancy;

125. A January 15, 2004 progress note from Dr. Pondo indicating findings of neck supple, chest clear to auscultation, extremities without clubbing, cyanosis, edema, neurologically non focal, and a diagnosis of pneumoconiosis and massive fibrosis;

126. A January 29, 2004 treadmill stress test indicating that Shinaberry had been tested at two miles per hour and had achieved

his target heart rate, tolerated the test well, without complications, and had post-test readings of pH 7.38; pCO2 36; pO2 57; HCO3 20, B.E. -3.6, and O2 Sat. 89;

127. A January 29, 2004 pulmonary function study at Chest Medical Services indicating that Shinaberry's pre-drug spirometry scores ranged from sixty-five to ninety-eight percent of predicted value;

128. A February 11, 2004 letter from Dr. Sharp to the West Virginia Workers' Compensation Division requesting authorization for treatment for bronchitis and pneumonia due to coughing, shortness of breath and congestion, reduced breath sounds in his lungs, and a chest x-ray that "revealed an infiltrate in the left lower and mid base." Dr. Sharp reported he had treated Shinaberry with Claforan, DepoMedrol, and Vitamin B12 and prescribed Avelox. Dr. Sharp referred Shinaberry to Dr. Pondo for further evaluation;

129. A February 16, 2004 office note from Dr. Pondo indicating a diagnosis of pneumoconiosis with his chest positive for wheezes;

130. A February 16, 2004 Neuropsychological Screening Profile from Sharon Joseph, Ph.D., indicating that Shinaberry reported a back injury, Black Lung disease, a neck injury, migraine headaches and memory loss. He listed his prescriptions as Albuterol,

Singulair, Ipratropium Bromide, Vioxx, Tizanidine, Alprazolam, Lorcet and Percocet, stated he did not use tobacco and drank alcohol rarely, and had never been treated for an emotional or psychological problem.  He informed Dr. Joseph that he was being treated by Dr. Brick, a neurologist.

Examination revealed Verbal IQ of 75, Performance IQ of 80, and Full Scale IQ of 75 and a determination of Borderline Range of Intellectual Functioning. Shinaberry was alert and oriented times three, reported difficulty sleeping, mild depression, poor appetite, denied suicidal or homicidal ideations, hallucinations, delusions, preoccupations, obsessions, or compulsions, displayed no "obvious physical limitations relative to dexterity, ambulation, or speech", had calm motor activity, had appropriate posture, average eye contact and language, and normal speed of speaking, had normal, immediate and remote memory, mildly impaired recent memory, moderately impaired judgment and mildly impaired concentration.

Activities of daily living included: awaking at 9:00 a.m., drinking coffee, watching television, eating dinner, retiring at 11:00 p.m., attempting to go outside in the afternoons depending on the weather, making his bed, dusting, cooking a meal, putting away groceries, taking out the garbage, walking to the mailbox, going

grocery shopping, driving a car, and managing his finances. He stated he could remember to turn off the stove, was unable to go up and down stairs well, could "fish a little" and enjoyed playing cards. Diagnostic impression was Axis I – adjustment disorder with depressed mood; Axis II – Borderline Intellectual Functioning; and Axis III – back injury, neck injury, Black Lung, history of testicular cancer, migraine headaches (all per Shinaberry's report). Dr. Joseph determined that his psychological prognosis was fair and he could manage benefits, and his socialization was within normal limits;

131. A February 18, 2004 letter from Dr. Sharp to the West Virginia Workers' Compensation Division requesting authorization for Lorcet, Vioxx, Zanaflex and Xanax, and indicating that Shinaberry reported his pain was "9/10 without pain medication, and 4/10 with pain medication." Dr. Sharp recommended a pain management consultation to determine if any treatment should be taken to relieve the pain and chronic muscle spasms;

132. A February 18, 2004 letter from Dr. Sharp to the West Virginia Workers' Compensation requesting approval for Singulair, Albuterol and Zithromax due to a continued cough. Dr. Sharp also

noted that Dr. Gaziano had recommended an evaluation for a "mass/density that was seen in his lungs;"

133 A March 15, 2004 progress report from Dr. Pondo indicating no cough or fever, supple neck, chest clear to auscultation, stable respiratory system, and noting that Dr. Pondo would observe Shinaberry "off r/x;"

134. A June 2, 2004, Physical Residual Functional Capacity Assessment indicating Shinaberry could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for six hours in an eight hour work day, sit for a total of six hours in an eight hour workday, had unlimited push/pull ability, was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl, had no manipulative, visual or communicative limitations, unlimited in his exposure to extreme cold and heat, wetness, humidity, noise, and vibration, and should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. The state agency physician reduced Shinaberry's residual functional capacity ("RFC") to light work;

135. A June 4, 2004 Psychiatric Review Technique from Rosemary K. Smith, Ph.D., indicating an organic mental disorder (borderline functioning), affective disorder (adjustment disorder), mild

limitation in his activities of daily living, moderate restriction in ability to maintain social functioning, mild limitation in ability to maintain concentration, persistence, and pace, and no episodes of decompensation. She determined that Shinaberry did not meet the "C" criteria of the Listings;

136. A June 4, 2004 Mental Residual Functional Capacity Assessment from Dr. Smith indicating moderate limitation in ability to understand and remember detailed instructions; moderate limitation in ability to carry out detailed instructions; moderate limitation in ability to interact appropriately with the general public; and no significant limitation in ability to remember locations and work-like procedures, ability to remember and understand very short and simple instructions, ability to carry out very short and simple instructions, ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule, maintain regular attendance and be punctual, ability to sustain an ordinary routine without special supervision, ability to work in coordination with or proximity to others without being distracted by them, ability to make simple work-related decisions, ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms

and perform at a consistent pace without an unreasonable number and length of rest periods, ability to ask simple questions, request assistance, accept instruction, respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or being distracted by them, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness, ability to respond appropriately to changes in the work setting, be aware of normal hazards, take appropriate precautions, travel in unfamiliar places, use public transportation, set realistic goals, or make plans independently of others. Dr. Smith determined Shinaberry would be "able to learn and perform simple, unskilled worklike activities;"

137. A June 9, 2004 independent medial evaluation ("IME") of Shinaberry from Joseph J. Renn, III, M.D., F.C.C.P., performed on May 19, 2004, which revealed no acute distress. Shinaberry's cardiac exam showed no trills, gallops or murmurs, his lungs were clear to palpation, percussion, and auscultation, he had no jugular venous distention, hepatojugular reflux, hepatomegaly, cyanosis, clubbing, or edema. He had a normal electrocardiograph and his chest radiograph showed category "C" complicated pneumoconiosis with no other abnormalities. He had a normal spirometry, lung

volumes, and resting arterial blood gases, and moderately reduced diffusing capacity that partially corrected toward normal when the alveolar volume was considered. Dr. Renn diagnosed "simple coalworkers' pneumoconiosis", "complicated coalworkers' pneumoconiosis" and "moderate diffusion abnormality" and determined that Shinaberry should not return to any type of "work where he [would be] exposed to coal mine dust owing to the presence of complicated coalworkers' pneumoconiosis" and that he was "totally and permanently impaired owing to both simple and complicated coalworkers' pneumoconiosis." Dr. Renn also determined that Shinaberry was incapable of performing heavy manual labor for extended periods of time due to his exercise-induced hypoxemia;

138. An August 23, 2004 award of benefits from the United States Department of Labor under the Black Lung Act for pneumoconiosis;

139. An October 14, 2004 resting pulmonary function study from the Occupational Lung Center for the West Virginia Occupational Pneumoconiosis Board indicating that the exercise component of this test was not administered due to back pain, a spirometry score ranging from 73% to 95% of the predicted value, pre-bronchodilator, and 79% to 95% of the predicted value, post-bronchodilator, a

diffusion score ranging from 56% to 80% of the predicted value, pre-bronchodilator, and 57% to 85% of the predicted value, post-bronchodilator;

140. A December 1, 2004 award of 65% disability from the West Virginia Workers' Compensation Commission due to occupational pneumoconiosis;

141. A January 25, 2005 letter from Dr. Sharp to Shinaberry's attorney indicting that Shinaberry could not walk three hundred feet on a level surface at a slow pace and, were he to carry ten pounds, his distance would be reduced to one hundred and fifty to two hundred feet, could walk fifty feet uphill, and, were he to carry ten pounds or a gun, he could walk only fifteen to twenty feet without resting, could not fly-fish due to neck and right arm pain, but might be able to "sit by the lake with a cane pole" and fish, was unable to perform all of his activities of daily living and his parental obligations, and was "unable to sit and drive over 15 miles without changing positions and stopping."  Dr. Sharp determined "[t]here [was] no unskilled sedentary type work, . . . any where [sic] within an hours [sic] drive of his home" and he "doubt[ed] that [Shinaberry] [was] capable of maintaining any type of unskilled, sedentary job;"

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

142. A January 25, 2005 Medical Assessment of Ability to do Work-Related Activities (Physical) from Dr. Sharp indicating Shinaberry's ability to lift or carry was affected by his impairment because he could not bend, lift or squat, could lift ten to twenty pounds for "5 minutes max", was unable to carry, his COPD affected his ability to stand or walk, had "very limited lung capacity," and pneumoconiosis, could walk ten minutes without interruption and for less than thirty minutes total, could sit ten minutes without interruption and for a total of two hours per day, could never climb, balance, stoop, and crouch, could occasionally kneel, crawl, and push/pull, was limited in reaching in all directions and gross manipulation with his right arm and hand, but had no other manipulative limitations, had visual limitations without glasses, but no visual limitations when he wore his glasses, and environmental restrictions included heights, moving machinery, temperature extremes, chemicals, and dust;

143. A January 27, 2005 report from Mohamed Fahim, M.D. of the Pain Management Clinic at Davis Memorial Hospital, indicating that Shinaberry had reported difficulty sleeping, as well as back pain, headaches, left leg weakness and depression. Examination revealed no thyromelgaly, regular cardiovascular rate and rhythm,

clear lungs to auscultation, bilaterally, soft and tender abdomen, no edema in extremities, steady and normal gait, ability to walk on tiptoes and heels, intact cranial nerves, intact and normal motor power in upper and lower extremities, bilaterally, intact and normal sensations in the upper and lower extremities, intact reflexes, decreased range of motion in his neck, tenderness over the cervical facet joints, bilaterally, straight leg testing was fifty degrees, bilaterally, positive Patrick's test, bilaterally, tenderness over both the lumbar facet joints on both sides, and tenderness over both sacroiliac joints. Dr. Fahim noted that Shinaberry's response "to the examination was exaggerated."

Dr. Fahim reviewed several diagnostic tests and offered the following opinions:

- April 21, 2001, MRI of lumbar spine showed degenerative disc disease, particularly affecting lower two or three lumbar vertebral levels as well as T12-L1 and L1-2, neural foraminal encroachment, no evidence for spinal canal stenosis, no definite nerve root impingement, and effacement inferiorly at L4-5, bilaterally;

- August 3, 2001, MRI of lumbar spine showed minimal diffuse disc bulge at L3-4, without significant mass effect, broad-based disc bulge at L4-5, with minimal bilateral recess stenosis, and evidence of artherosclerotic change in the aorta;

- October 26, 2001, dynamic motion x-ray of lumbar spine showed minimal osteoarthritis, narrowing of L1-L2 disc space, and restricted motion on lateral bending to right;

51

- March 18, 2002, MRI of lumbar spine showed mild degenerative disc disease and tiny central protrusions noted at T12-L1 and L1-2;

- March 18, 2002, plain x-ray of lumbar spine showed mild degenerative changes; and

- June 3, 2002, lumbar spine CT scan and lumbar myelogram CT showed mild diffuse disc bulge at L4-5 without significant mass effect and mild disc bulge at L5-S1 without significant mass effect.

Dr. Fahim diagnosed bilateral lumbar facet joint disease, bilateral sacroiliac joint disease, bilateral cervical facet joint disease, degenerative disc disease of the lumbar spine, myofascial pain syndrome of the upper and lower back, Black Lung disease, headaches, and multiple pain complaints, including lower back pain, neck pain, and bilateral lower extremity pain. He continued the medications prescribed by Dr. Sharp, referred Shinaberry to Dr. Sharon Joseph for a psychological evaluation, and scheduled left lumbar facet joint injections, right lumbar facet joint injections, left sacroiliac joint injections, right sacroiliac joint injections, right cervical facet joint injections, and left cervical facet joint injections. Dr. Fahim noted that, if Shinaberry's pain continued after the series of injections, he would consider lumbar epidural steroid injections;

144. A March 23, 2005 letter from Dr. Sharp to Shinaberry's attorney indicating that Shinaberry had been diagnosed with occupational pneumoconiosis with total pulmonary function impairment by the Occupational Pneumoconiosis Board, and that he had not completed the July 24, 2003 and October 14, 2004 exercise tolerance testing by the Occupational Pneumoconiosis Board because of heart disease during the first exam and back pain during the second exam;

145. An April 21, 2005 letter from Dr. Sharp to Shinaberry's attorney indicating:

> Jerry was injured on 04-11-00. He has been on pain medication Lorcet 10-650, Zanax, Zanaflex, Vioxx and/or Celebrex for four years. He has been referred to Dr. Fahim (Pain Management Clinic)(Report attached) who continued the medication and who is giving trigger injections. Rule 20 gives a time frame for narcotic mediation. However, Jerry has never been tapered from his medications or stopped his medications. His pain is chronic and progressive and does not fall under the guides of Rule 20 for treatment of acute and transient pain.
>
> WVWCC does not have a specific "RULE" for treating chronic, progressive pain with and/or without depression. They say refer to a pain management clinic. If pain management says continue medications, WVWCC pulls out Rule 20. If pain management puts in a morphine pump or spinal stimulator they pay for this and